**Leo WOMACK, Administrator of the Estate of H. Lane McClanahan, Deceased, Appellant,**

v.

**FIRST NATIONAL BANK OF SAN AUGUSTINE, Texas, Appellee.**

No. 1287.

Court of Civil Appeals of Texas, Tyler.

March 12, 1981.

Rehearing Denied April 9, 1981.

Benton Musslewhite, Houston, for appellant.

J. L. Smith, Ramsey, Smith & Mitchell, San Augustine, for appellee.

SUMMERS, Chief Justice.

The First National Bank of San Augustine, Texas, appellee, sued Charles C. McClanahan and his brother, Dr. H. Lane McClanahan to recover upon five promissory notes. The bank alleged that the notes represented individual obligations of each of the brothers or, alternatively, were partnership obligations executed by Charles C. McClanahan on behalf of a partnership composed of the two brothers named "McClanahan Brothers." Charles C. McClanahan answered, admitting liability and claiming that the notes were partnership notes. H. Lane McClanahan filed a general denial and by verified plea alleged *non est factum*. Prior to trial, Dr. McClanahan died, and upon suggestion of death, his estate, by and through its Temporary Administrator, was substituted as a party defendant. The case was tried before a jury which, in response to special issues submitted, found that the notes were partnership obligations; judgment was rendered for appellee from which Dr. McClanahan's estate appeals.

We affirm.

It appears from the record in this case that for a number of years the McClanahan brothers had a continuing banking relationship with appellee bank. The inception of this relationship appears to have been in April 1971 when Dr. Lane McClanahan wrote an officer of the bank a letter which stated:

Dear Mr. Howard,

I am sending you a financial statement. My brother, Charles McClanahan wants to do business with you for some of the farming operations.

Sincerely yours,
/s/ H. Lane McClanahan, M.D.

Enclosed with this letter was Dr. McClanahan's personal financial statement.

Thereafter, on August 4, 1972, the McClanahan brothers executed a partnership agreement for the express purpose of engaging in the operation of a hog farm. By this agreement, which consisted of only four provisions and covered only a half page, the brothers agreed that Charles was to devote his time to the business and in return, receive 75% of the profits and share 50% of the losses while Lane would receive 25% of the profits and share 50% of the losses. Additionally, the agreement provided that the partnership funds would be kept in a joint account and Charles agreed "... to keep a complete record of the business, and shall be subject to inspection by Lane at any time." The agreement does not contain any provision relative to the partners' authority, nothing limiting their authority nor defining it. No partnership name is indicated in the agreement and there is testimony that the partnership operated under the names "McClanahan Farms," "C. C. McClanahan Farms," "McClanahan Brothers" and "Sugar Bush Farms" interchangeably. There is also testimony in the record that this agreement, as well as Dr. McClanahan's letter and accom-

panying financial statement were contained in the bank's files for the entire period that the bank dealt with the partnership.

Following formation of the partnership, Lane and Charles McClanahan began executing a series of notes with appellee bank as payee. The first of these, for the sum of $10,000, was executed on September 15, 1972. Over an eight-month period the brothers signed four notes with appellee bank for a total of $30,000. In a deposition taken before his death, which was admitted into evidence at trial, Dr. McClanahan admitted executing these four notes. Both he and his brother testified that the money which was loaned under these notes was used to finance the hog farm and to carry on its business. All four original notes reflect on their face that they were executed in contemplation of investment in the partnership business, each containing notations that they are secured by either livestock, feeding equipment or hogs. These four notes are signed "Charles McClanahan" or "C. C. McClanahan" and "H. Lane McClanahan, M.D." At the top of the notes is printed the word "NAME" followed by a blank on which is typed-in the name "McClanahan Brothers" on two of the notes and "Charles McClanahan and H. Lane McClanahan" on the other two. All but one of these notes was paid and the remaining note (No. 4088) was renewed by note number 7554 on October 18, 1974. Note number 4088 has the name "McClanahan Brothers" typed at the top. The renewal note, which both brothers admitted executing, is signed "McClanahan Farms By: C. C. McClanahan By: H. Lane McClanahan, M. D." and the name "McClanahan Brothers" is typed at the top. When this note matured, it too was renewed by note number 10828 which has the name "McClanahan Farms" typed at the top and is signed "C. C. McClanahan" underneath which appears the signature "H. Lane McClanahan." Charles McClanahan admitted signing his brother's name to this as well as the four other notes (described hereinafter) which form the basis of the bank's suit (notes numbers 11,364; 11,365; 11,551; 11,550).

The notes upon which the bank sued are all renewal notes. These notes as well as their predecessors reflect a continuing lending relationship between the bank and the partnership over a period from April 28, 1973, to May 1, 1975. They, as well as their precursors were executed by Charles McClanahan who also signed his brother's name to the notes. The earlier notes all have one of the names under which the partnership operated noted in the top margin. Additionally, each of the predecessor notes contains language on its face indicating that the notes were executed for the purpose of carrying on the partnership business; notations such as "339 Feeder Pigs," "breeding sows and boars," "feeding equipment," etc., were made on each of these notes in the lower left-hand corner. Some of the predecessor notes were executed as follows:

 McClanahan Farms (typewritten)
 By: C. C. McClanahan
or
 McClanahan Farms (typewritten)
 C. C. McClanahan
or
 McClanahan Bros. (handwritten)
 C. C. McClanahan

Likewise, each of the notes upon which the bank sued reflect on their face similar notations.[1]

Charles McClanahan testified that he considered himself in charge of the farm pursuant to the partnership agreement. In his deposition, Dr. McClanahan testified as follows:

---

1. a. Note No. 11,364—The name "McClanahan Farms" appears in the top margin; the notation "339 Feeder Pigs" appears in the lower left-hand corner.
 b. Note No. 11,365—The name "McClanahan Farms" appears in the top margin, "breeding sows and boars" in the lower left-hand corner.
 c. Note No. 11,551—The name "McClanahan Farms" appears in the top margin, "240 feeder pigs" in the lower left corner.
 d. Note No. 11,550—The name "McClanahan Farms" appears in the top margin, "170 hogs, feeding equip." in the lower left corner.

Q: What was Charles supposed to do in the business venture?

A: It was more or less his operation that he was going to build the hog farm and raise the hogs and do all the raising of the hogs.

Charles McClanahan testified that he devoted his time to the operation of the farm, buying and raising hogs, feeding them, selling them, using the money of appellee bank in the operation of the business. As he would sell hogs, he would make payments to the bank and to his brother and borrow additional funds executing notes therefor, thus maintaining a running account with the bank for the benefit of the partnership. Ray Neal McEachern, one of appellee bank's officers, testified:

Q: How did Charles make payments on those notes?

A: As he would sell his pigs.

Q: Would he borrow money to buy the pigs—

A: Yes, sir.

Q: And then when he would sell some, he'd come in and pay?

A: That's right. It was a revolving type credit.

Appellant predicates his appeal on twenty-eight rather involved points of error, several of which we have grouped for the ease of discussion. Points of error 1–4 and 14–16, all of which are no evidence or insufficient evidence points and points 13 and 17–19 all involve partnership law as it relates to negotiable instruments. Basically, these points of error, taken together, contend that in executing the subject notes, Charles McClanahan was not acting in his character as agent of the partnership; furthermore, appellant contends that since Dr. McClanahan admittedly did not sign the notes, which were not executed in the partnership name or executed with Dr. McClanahan's express authority, neither he nor his estate can be bound thereby, parol evidence being inadmissible to show that the notes were partnership rather than individual obligations.

■ In support of his contention that Dr. McClanahan's estate cannot be held liable on the subject notes since he did not sign the notes himself or authorize his signature thereon, appellant refers to Tex.Bus. & Com.Code Ann. § 3.404(a) (Vernon 1967).[2] That provision provides:

Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

Since it is undisputed that Dr. McClanahan did not sign the notes which are the basis of this suit and since no issue was submitted to the jury concerning ratification or estoppel, we agree with appellant that Dr. McClanahan's alleged signature on the note is wholly inoperative as his own. We have examined the record and have found no evidence that Dr. McClanahan authorized his brother to sign *his name* to the notes. In this connection, we note that § 3.401(a) T.B. & C.C. provides that "No person is liable on an instrument unless his signature appears thereon." However, as we view this case and the evidence before us, it is immaterial that Dr. McClanahan did not personally sign the notes. In full recognition of that rule (that one is not liable on an instrument unless he signs it), our supreme court has stated that there are several instances in which a non-signing partner may be liable upon a note signed by another partner. *See. e. g., Edwards Feed Mill v. Johnson,* 302 S.W.2d 151, 160 (Tex.Civ.App.—San Antonio) (Pope, J., dissenting) rev'd 158 Tex. 313, 311 S.W.2d 232 (1958) and cases cited therein.

A partner's authority to bind the partnership and his partners is governed by the Texas version of the Uniform Partnership Act[3] unless expanded or limited by the partnership agreement. Section 9 of the U.P.A. provides that:

---

2. Hereinafter referred to as T.B. & C.C.

3. Tex.Rev.Civ.Stat.Ann. art. 6132b (Vernon 1962), hereinafter referred to as U.P.A.

(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

As we construe this section, Dr. McClanahan may be held liable on the notes as a partner if they were executed for "apparently carrying on in the usual way the business of the partnership." Thus, since the partnership agreement was silent as to Charles McClanahan's authority to issue negotiable paper in the partnership name, he had the actual or express authority to do so under § 9 if such act were for the purpose of "apparently carrying on" the business of the partnership in the way other firms engaged in the same business in the locality usually transact business, or in the way in which the particular partnership usually transacts its business. *Burns v. Gonzales*, 439 S.W.2d 128, 131 (Tex.Civ.App.—San Antonio 1969, writ ref'd n. r. e.); 60 Am. Jur.2d *Partnership* § 132 (1972). Whether Dr. McClanahan was aware that Charles was executing the notes has no effect upon his authority to do so, "for it is familiar law that each member of a partnership has, as agent, power to bind all members of his firm for an indebtedness incurred in the prosecution of his firm's business; and this is true even though members other than the acting one is [sic] without knowledge of the obligatory act." *Mitchell v. City National Bank of Wichita Falls*, 14 S.W.2d 909, 910 (Tex.Civ.App.—Fort Worth 1929, writ ref'd n. r. e.). Stated another way, it has been said that an agent's authority is presumed to be co-extensive with the business entrusted to his care. He is limited in his authority to such acts as are incident to the management of the particular business with which he is entrusted. *Boyd v. Leasing Associates, Inc.*, 516 S.W.2d 485 (Tex.Civ. App.—Houston [1st Dist.] 1974, writ ref'd n. r. e.). Thus, the inquiry becomes whether Charles McClanahan executed the notes in order to conduct the business, which Dr. McClanahan testified had been entrusted to his care, in its ordinary and normal manner, there being no evidence in the record as to the normal business transactions of other hog farms in San Augustine County.

We believe that there was ample evidence to support the jury's finding that Charles McClanahan had the authority to execute the notes and bind the partnership thereto. The notes themselves reflect that the monies loaned upon the notes were invested in the partnership business; the farm was initially financed over an eight-month period by the execution and payment of a series of notes; the partnership agreement did not attempt, in any manner, to limit Charles McClanahan's authority. This conclusion is further buttressed by the fact that partners normally have the right to execute negotiable paper for commercial purposes consistent with the object of the partnership and for the benefit of the partnership. *See, Brewer v. Big Lake State Bank*, 378 S.W.2d 948, 951 (Tex.Civ.App.—El Paso 1964, no writ); *Edwards v. Dunlap*, 97 S.W.2d 978 (Tex.Civ.App.—Amarillo 1936, writ dism'd). Where the partnership business contemplates periodical or continuous or frequent purchasing, not as incidental to an occupation, but for the purpose of selling again the thing purchased, it is usual and customary to purchase on credit and to execute paper evidencing the existence of the partnership debt. *Burns, supra* at 133. Both Charles McClanahan and Ray Neal McEachern testified that Charles would execute a note, buy hogs and feed them on the proceeds thereof, sell them and pay on the notes. Such was the customary business of the partnership. We must therefore conclude that Charles McClanahan had the actual authority to execute the notes in question as partnership obligations.

Thus, having decided that there was evidence of probative force to support a finding that Charles McClanahan had the authority to execute the notes for the part-

nership, we next turn to the question of whether the manner in which the notes were executed is sufficient to bind the partnership. In making this decision we are guided by § 3.403(b)(2) T.B. & C.C. which provides:

> (b) An authorized representative who signs his own name to an instrument
>
> (2) *except as otherwise established between the immediate parties,* is personally obligated if the instrument names the person represented but does not show that the representative signed in a representative capacity, or if the instrument does not name the person represented but does show that the representative signed in a representative capacity. (Emphasis supplied.)

Official comment 3 to § 3.403 makes it clear that as between the immediate parties parol evidence is admissible to prove a signature by an agent in his representative capacity where the instrument names the person represented but does not show that the person signed in a representative capacity. *See,* 97 A.L.R.3d 798 "Construction and Application of U.C.C. § 3–403(2) dealing with Personal Liability of Authorized Representative Who Signs Negotiable Instrument in His Own Name," §§ 6(b) and 8 (1980).

Our supreme court in *Griffin v. Ellinger,* 538 S.W.2d 97 (Tex.1976) stated that:

> Under Section 3.403(b), extrinsic evidence is admissible between the immediate parties to the instrument to show that they agreed or otherwise understood that the signer would not be personally liable thereon, even though the instrument itself does not reveal the signer's representative capacity. The Code does not delineate what proof is necessary to "otherwise establish" between the parties that the signer is not personally liable on an instrument which he intended to sign only in a representative capacity. Therefore, the general principles of law and equity are to be applied. Section 1.103. In *Seale v. Nichols,* 505 S.W.2d 251 (Tex. 1974), this Court had occasion to construe Section 3.403(b). We there stated that, in order for an agent to avoid liability on his signature, "he must disclose his intent to sign as a representative to the other contracting party." 505 S.W.2d at 255. We also recognized that *prior dealings between the parties are relevant in determining whether the parties understood the signature to be in a representative capacity.* (Emphasis supplied.)

In *Griffin,* there was some evidence that Ellinger, the payee on the check, was not aware of Griffin's representative capacity when he received the check in question.

According to *Griffin* and cases annotated at 97 A.L.R.3d, *supra,* extrinsic evidence was admissible as between the bank and the defendant brothers to show that, although Dr. McClanahan did not expressly authorize his brother to place his signature on the notes, Charles McClanahan executed the notes in a representative capacity. As factually distinguished from *Griffin,* there is evidence in this case that the bank treated the signature as being made in a representative capacity. The notes in issue here reflect on their face that they were intended as partnership obligations; their predecessor notes were either executed "McClanahan Farms by: /s/ C. C. McClanahan" or are accompanied by security agreements which name as the debtor McClanahan Farms and are signed by C. C. McClanahan; the evidence shows that the bank had a copy of the partnership agreement in its files at all times during the financial relationship with the McClanahan brothers; the bank's liability ledger sheet showed liability was carried in both brothers' names and Mr. McEachern testified on behalf of the bank that it was relying upon Dr. McClanahan's financial integrity in making the loans and that the bank had a copy of his financial statement and aforementioned letter in its files. Such is evidence of probative force of Charles McClanahan's execution of the notes in a representative capacity and as partnership obligations as to support submission of the issue to the jury as well as the judgment of the trial court. Accordingly, appellant's points of error nos. 1–4 and 13–19 are overruled.

Appellant has relied quite heavily upon *First State Bank of Riesel v. Dyer*, 151 Tex. 650, 254 S.W.2d 92 (1953) as being dispositive of this case. There is one major factor which sets that case apart from this one. In *Dyer*, there was nothing on the note to indicate that liability thereon was anything more than the personal obligation of Woodside and his wife. The bank, while cognizant of the fact that Dyer was Woodside's partner, never asked or demanded that the firm name be signed or that Dyer sign any of the notes. Additionally, the bank's liability ledger sheet showed that liability was carried only in the name of Clinton Woodside.

■ By his fifth point of error appellant contends that the trial court erred in rendering judgment for appellee bank on the basis of Special Issue No. 3 because "... neither it, nor a companion issue, inquired whether the McClanahan Brothers' partnership, if any, was a 'trading partnership.'" We find this argument specious in light of the commentary to § 9 of the U.P.A. Therein it is noted that in adopting § 9, it was intended that the prior artificial and irrational distinction between "trading" partnerships (which have implied power to borrow regardless of whether the loan is obtained in the usual course of business) and "non-trading partnerships" (which have no such power) be abolished. The *Burns* case cited above contains a discerning discussion on this point at page 132. *See also,* 60 Am.Jur.2d *Partnership* § 130. Since this distinction no longer exists, we hold that it was not improper to omit an issue relative thereto and appellant's fifth point of error is overruled.

■ In his sixth point of error, the Administrator of Dr. McClanahan's estate complains of Special Issue No. 3 [4] since it failed to inquire whether an "agreement to be partners" between the brothers existed at the time the subject notes were executed. In a connected point of error, point eight, the appellant complains that Special Issue No. 3 "contained a prejudicial comment upon the evidence by assuming, impliedly, and impliedly directing the jury to assume, that a partnership between Lane McClanahan and Charles McClanahan existed on the dates the subject notes were executed." We have examined the transcript and find that the appellant failed to deny by verified plea the existence of the partnership as required by Tex.R.Civ.P. Rule 93(f). In such a state of the record, the partnership stands as admitted. *Sims v. Hill*, 567 S.W.2d 912, 913 (Tex.Civ.App.— Houston [14th Dist.] 1978, no writ); *Howell v. Bowden*, 368 S.W.2d 842, 845 (Tex.Civ. App.—Dallas 1963, writ ref'd n. r. e.). Additionally, Mr. McEachern testified that the bank never received notice of any type of termination of the partnership until it received a letter from appellant's attorney in July 1976 notifying it that appellant was contesting the bank's claim. Even though the partnership was terminable at will, it would continue as to creditors who had dealt with the partnership within two years of dissolution.[5] Appellant argues that he terminated the partnership in February of 1973. The bank dealt with the partnership within two years of that date yet never received notice of termination. Therefore,

---

4. Special Issue No. 3 inquired:

Do you find from a preponderance of the evidence that the said Defendant, Charles McClanahan, in executing said notes, was acting as the partner of Defendant, H. Lane McClanahan, with his express or implied consent for the benefit of the farming operation?

5. Sec. 35. (1) After dissolution a partner can bind the partnership except as provided in paragraph (3):

(b) By any transaction which would bind the partnership if dissolution had not taken place, provided the other party to the transaction:

(I) Was a creditor of the partnership at the time of dissolution or had extended credit to the partnership within two years prior to dissolution and, in either case, had no knowledge or notice of his want of authority; or

(II) Though he was not such a creditor or had not so extended credit, had nevertheless known of the partnership prior to dissolution, and, having no knowledge or notice of dissolution, the fact of dissolution had not been advertised in a newspaper of general circulation in the place (or in each place if more than one) at which the partnership business was regularly carried on.

even though Dr. McClanahan may have terminated the partnership between himself and his brother, it continued as to the bank during the time which the notes were executed since the bank never received due notice of dissolution. § 35 U.P.A.; *Boyd, supra* at 488; *Wolfe v. East Texas Seed Co.,* 583 S.W.2d 481 (Tex.Civ.App.—Houston [1st Dist.] 1979, error dism'd). Appellant's sixth and eighth points of error are overruled.

 Additionally, appellant complains of the admission into evidence of certain partnership income tax returns. (Points of error 21 and 22). These tax returns were introduced for the purpose of proving the existence of the partnership in 1974. In light of the appellant's failure to deny the partnership pursuant to Rule 93(f), as well as a lack of notice of termination to the bank, we hold that the error, if any, was rendered harmless. Appellant's points of error twenty-one and twenty-two are also overruled.

 In point of error number twenty appellant contends that the trial court erred, in violation of the Dead Man's Statute,[6] in allowing Charles McClanahan to testify about any conversations or transactions with the decedent H. Lane McClanahan, because, by aligning himself with the plaintiff in his pleadings, he made his testimony inadmissible. According to the Dead Man's Statute, Charles McClanahan, as a party to the action, was initially incompetent to testify about any transaction with his deceased brother; however, waiver of that incompetency is expressly authorized by the statute. Where one party calls the opposite party to the stand and asks him about a transaction with the decedent, the adverse party witness becomes competent to testify. *Estate of Williams v. Williams,* 301 S.W.2d 696, 697 (Tex.Civ.App.—San Antonio 1957, writ ref'd n. r. e.); 1 R. Ray, Texas Law of Evidence § 332 (Texas Prac-

tice 3d ed. 1980). Appellant argues that the bank could not waive the statute by calling Charles McClanahan because he was not an adverse party. Admittedly, some controversy has arisen over the meaning of "opposite party" where one defendant has an interest adverse to that of his co-defendant. The sound view seems to be that "opposite party" means opposite party of record and when the other party calls him to testify he is competent. *Sanders v. Kirbie,* 94 Tex. 564, 63 S.W. 626, 627 (1901); *Hoxie v. Farmers' & Mechanics' National Bank,* 20 Tex.Civ.App. 462, 49 S.W. 637, 639 (1899, writ ref'd); Ray, *supra* at § 326; *contra; Roscoe v. Walker-Smith Co.,* 98 Tex. 565, 86 S.W. 728, 729 (1905). Even were we to hold that the bank could waive the statute by calling Charles McClanahan as an adverse party, his testimony may not have been admissible against his brother's estate. The right of Dr. McClanahan's administrator to object could not be waived by another party to the suit. The fact that a party questions one adverse party regarding a transaction and thereby waives the statute as to such witness, does not constitute a waiver of the statute as to other adverse parties. *Ball v. Parks,* 278 S.W.2d 189 (Tex.Civ.App.—Fort Worth 1955, writ dism'd); *Denbo v. Butler,* 523 S.W.2d 458, 461 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ). We decline, however, to decide this question since appellant has failed to sufficiently present this point on appeal in accordance with Tex.R. Civ.P. Rule 418(e). That rule provides, *inter alia,* that "if complaint is made of the improper admission or rejection of evidence, the full substance of such evidence so admitted or rejected shall be set out with reference to the pages of the record where the same may be found." Nowhere in appellant's brief is evidence specifically pointed out as being objectionable on the basis of the Dead Man's Statute. He seems to con-

---

6. Tex.Rev.Civ.Stat.Ann. art. 3716 (Vernon 1925):

In actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the others as to any transaction with, or state-

ment by, the testator, intestate or ward, *unless called to testify thereto by the opposite party*; and the provisions of this article shall extend to and include all actions by or against the heirs or legal representatives of a decedent arising out of any transaction with such decedent. (Emphasis supplied.)

tend that any of Charles McClanahan's testimony concerning transactions with his brother contained in the statement of facts before us is improperly admitted and apparently expects this court to sift through that lengthy testimony in search of error. Such a position is untenable and appellant's point of error number twenty is overruled. *Soltner v. Flores*, 335 S.W.2d 771, 772 (Tex.Civ. App.—El Paso 1960, no writ); *Farris v. Moore*, 293 S.W.2d 683, 685 (Tex.Civ.App.—Texarkana 1956, writ ref'd n. r. e.); *Inesco, Inc. v. Sears*, 567 S.W.2d 827, 829 (Tex.Civ. App.—Beaumont 1978, writ ref'd n. r. e.).

By his twenty-sixth point of error, appellant argues that the trial court should have sustained his challenge for cause, on the basis of prejudice, to several jurors. Appellant relies upon a Bill of Exception, presented to this court by way of supplemental transcript, to support his contentions. The Bill of Exception before us was not approved by the trial judge or by opposing counsel and is not a bystander's bill and as such presents nothing for appellate review. *Sisk v. Randon*, 123 Tex. 326, 70 S.W.2d 689, 692 (1934); *Goodpasture v. Coastal Industrial Water Authority*, 490 S.W.2d 883, 885 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n. r. e.); *Scoggins v. Scoggins*, 531 S.W.2d 245 (Tex.Civ.App.—Tyler 1975, no writ). The ultimate question of whether a prospective juror is in fact disqualified by reason of interest, bias or prejudice must depend upon the evidence. Since the only evidence before us on this issue is contained in appellant's unapproved Bill of Exception, we cannot say that the trial court erred in impliedly finding that the jurors in question were not disqualified. The court had the opportunity to see, hear and size up the jurors and was in a much better position than we to determine their qualification. *Erwin v. Consolovo*, 521 S.W.2d 643, 646 (Tex.Civ.App.—Fort Worth 1975, no writ); *McBroom v. Brown*, 277 S.W.2d 310 (Tex.Civ.App.—Beaumont 1955, writ ref'd n. r. e.). Accordingly, appellant's twenty-sixth point of error is overruled.

Appellant's twenty-seventh point of error alleges that the trial court should have granted him a new trial on the basis of jury misconduct. He asserts that misconduct is manifested by statements of certain jurors to the effect that Dr. McClanahan had the burden of notifying the bank that the partnership had been terminated and his failure to do so required them to answer Special Issue No. 3 in the affirmative. At the outset we note that of the jurors' testimony brought to our attention mentioning that Dr. McClanahan should have notified the bank of termination of the partnership (if in fact it was terminated), none state that such mandated an affirmative answer to Special Issue No. 3.

In reviewing an alleged act of misconduct, the appellate court must examine the entire record, including evidence heard at the main trial as well as at the hearing on a motion for new trial. *Lewis v. Yaggi*, 584 S.W.2d 487 (Tex.Civ.App.—Tyler 1979, writ ref'd n. r. e.). Certain guidelines control such a review. Three elements must be asserted and proved by the movant to be entitled to a new trial: (1) that an act of misconduct occurred; (2) that it was material; and (3) that it was calculated and probably did result in harm. Rule 327, T.R. C.P.; *Flores v. Dosher*, 608 S.W.2d 831 (Tex.Civ.App.—Corpus Christi, 1980); *Naranjo v. Cull*, 569 S.W.2d 529, 531 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n. r. e.). No findings of fact or conclusions of law were filed concerning the hearing on the motion for new trial, so we must presume that the trial judge found one or more of the elements of misconduct missing. *Naranjo, supra; Tees v. Tees*, 546 S.W.2d 912, 915 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ). What the jurors discussed was no more than a correct statement of the law as provided in § 35 of the U.P.A. discussed above. We conclude that no act of misconduct occurred and overrule appellant's twenty-sixth point of error.

We have reviewed appellant's remaining points of error and find that they are without merit. They are accordingly overruled.

Affirmed.