FDIC/MANAGER FUND, Appellant,

v.

Max LARSEN, Trustee, Appellee.

No. 05-88-00137-CV.

Court of Appeals of Texas,
Dallas.

May 17, 1990.

Rehearing Denied July 3, 1990.

Michael Byrd, Houston, Mary L. O'Connor, W. Ralph Canada, Jr., Dallas, for appellant.

Mark H. How, Michael C. Barrett, Marcia F. Pennell, Dallas, for appellee.

Before WHITHAM, ROWE and BAKER, JJ.

**38**

## OPINION

ROWE, Justice.

The Federal Deposit Insurance Corporation, as manager of the Federal Savings and Loan Insurance Corporation Resolution Fund and as successor in interest to American Savings Bank, appeals the judgment entered against American Savings and Broadmoor Villas, Inc. and in favor of Max Larsen as trustee for the Max Larsen Trust. The FDIC asserts certain federal law defenses to Larsen's claims of fraud and misrepresentation. We hold that the federal defenses bar Larsen's claim as a matter of law, and we reverse the judgment of the trial court and render judgment in favor of the FDIC.

In 1981, the Larsen Trust sold five undeveloped acres in Irving, Texas, to Broadmoor Villas for development of a condominium project. The sale was expressly contingent on Broadmoor Villas's ability to obtain a construction loan. Commonwealth Savings Association made the loan in the amount of $5,472,000 secured by a deed of trust granting Commonwealth the first priority lien on the property.

At the closing of the transaction, Broadmoor Villas paid Larsen $300,000 cash and delivered two notes in the amount of $217,630.55 and $400,000. The $400,000 note was to become due in sixty days. Larsen retained a vendor's lien on the property which was expressly subordinate to Commonwealth's lien. Broadmoor Villas did not pay the $400,000 note when it matured in March 1982. The $217,630.55 note was to be paid no later than March 16, 1984.

Late in 1982, Broadmoor Villas obtained refinancing from Congressional Mortgage Corporation to repay the Commonwealth loan and to complete construction of a condominium. Congressional lent $5,600,000 to Broadmoor Villas, and Broadmoor Villas assigned Commonwealth's first deed of trust lien to Congressional. Early in 1983, Larry Thompson, the attorney who represented Broadmoor Villas in the refinancing transaction, delivered copies of the Congressional loan agreement, a subordination of the vendor's lien agreement and deed of trust, and a release agreement to L.W. Gray, Larsen's attorney, along with two checks representing payment in full of the $217,630.55 note with interest and $40,000 in interest on the $400,000 note. Larsen executed the subordination agreement in which he agreed that the deed of trust securing the $400,000 note would be subordinate to the lien created by the deed of trust given to Congressional. In addition, Larsen executed the release agreement in which he agreed to release portions of his second lien pro rata if and when he received partial payment of the $400,000 note. Larsen contended in his pleadings that he executed the subordination and release agreement based on representations made by Thompson, including representations that arrangements had been made for Congressional to handle the mortgage on the sale of condominium units being constructed, that the project was substantially completed with the first unit ready for sale, that Congressional was an experienced lender and had audited and appraised the project before getting involved, that Congressional would administer funds and draws, and that the Congressional financing was sufficient to complete the proposed improvements.

Congressional assigned to American Savings the note received from Broadmoor Villas in the refinancing transaction and its first lien security interest under the deed of trust thereby vesting American Savings with the first lien on the property. American Savings had the decision-making authority with respect to the disposition of the loan, such as the decision to foreclose. Congressional was responsible for servicing Broadmoor Villas's loan.

On January 5, 1983, the president of Broadmoor Villas, Robert Gilliam, died. Charles Hagen, a mortgage banker who assisted Broadmoor Villas in closing the Congressional loan, inspected the books and records of Broadmoor Villas and evaluated the status of the project and feasibility of completing it. He discovered that Gilliam had misappropriated funds lent by Commonwealth and that substantial amounts were owed to subcontractors.

Congressional asked Hagen to oversee completion of the project. In addition, Broadmoor Villas, with the consent of Gilliam's widow, entered into an agreement with a newly formed group called Tri–T, consisting of Hagen, Thompson, the attorney who represented Broadmoor Villas in the Congressional closing, and Frank Nusbaum, Broadmoor Villas's construction superintendent. Tri–T undertook responsibility for managing and operating Broadmoor Villas's project, including financing, marketing, and construction.

Later in January, Hagen called a meeting of the project's subcontractors for the purpose of requesting that they complete the project even though they had not been paid for past work. Henry Kaspar, a builder, attended the meeting at Larsen's request. Kaspar reported to Larsen that Hagen stated at the meeting that the project was continuing under his supervision, that Broadmoor Villas did not have the money to pay outstanding bills, that Congressional would advance funds to pay for new work, and that the unpaid amount on past work would be paid if the project were completed and sold for a profit.

Broadmoor Villas defaulted under terms of the loan agreement, and American Savings gave notice of foreclosure in June or July 1983. This notice was withdrawn and a second notice issued the following month. By the time the second notice issued, American Savings had advanced $5,444,692.11. Despite default, American Savings advanced additional loan disbursements through October 1983. By August 1983, work on the project had ceased. The project was ninety percent complete. Six weeks and $500,000 were needed to complete the project, but Broadmoor Villas did not have the ability to obtain the funds. On August 2, 1983, two of Broadmoor Villas's creditors filed an involuntary bankruptcy petition against it. The petition delayed the foreclosure sale until April 1984 when American Savings bought the property at public auction for $4,800,000. Since the sale proceeds were less than the amount owed American Savings, Larsen's second lien was extinguished by the foreclosure.

Larsen sued Broadmoor Villas and Congressional, alleging that:

(1) he was induced by false and material misrepresentations to execute the subordination agreement and refrain from foreclosing on the deed of trust;

(2) alternatively, the misrepresentations constituted agreements that were breached by Congressional and Broadmoor Villas;

(3) Broadmoor Villas was an agent of American Savings, and therefore American Savings is liable for all claims against Broadmoor Villas;

(4) he was fraudulently induced to execute the subordination agreement;

(5) Congressional and Broadmoor Villas negligently made the misrepresentations which proximately damaged Larsen;

(6) Congressional and American Savings were the alter ego of Broadmoor Villas;

(7) Congressional and Broadmoor Villas willfully, intentionally, and maliciously defrauded Larsen, and therefore Larsen is entitled to punitive damages; and

(8) Larsen is entitled to attorney fees, prejudgment interest, and actual damages.

American Savings, as holder of the note, intervened in the suit and denied Larsen's allegations. Following jury findings unfavorable to the positions of defendants Broadmoor Villas and Congressional and intervenor American Savings, the trial court entered judgment for Larsen against Broadmoor Villas and American Savings on November 11, 1987. An order entered in the United States Bankruptcy Court for the Eastern District of Virginia prohibited the entry of any judgment against Congressional.

After American Savings appealed the judgment to this Court, the Federal Home Loan Bank Board approved the supervisory conversion merger of American Savings into Citizens Federal Bank as part of a plan to resolve the financial difficulties of American Savings. As part of the supervised merger plan, the Federal Savings and Loan Insurance Corporation in its corporate capacity agreed to purchase certain assets

and assume certain liabilities of American Savings. The FSLIC–Corporate instructed Citizens Federal to take no further action in the Larsen suit since the FSLIC–Corporate was the holder and owner of the assets subject to the suit. On June 19, 1989, the FSLIC–Corporate was substituted as appellant in this litigation in place of American Savings. In addition, the FSLIC–Corporate was granted leave to file a supplemental and amended brief raising, in part, certain federal law defenses previously unavailable to American Savings. The FSLIC–Corporate asserted that protections granted by federal statutory and common law prohibited Larsen from asserting his claims of fraud and misrepresentation to vary the written terms of or to rescind the release and subordination agreement. *See* 12 U.S.C.A. § 1823(e) (West 1989); *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). On October 30, 1989, the FDIC/Manager Fund, as the manager of the FSLIC Resolution Fund and as successor in interest to the FSLIC, was substituted as appellant in this litigation.[1]

In response to assertion of the federal law defenses by the FSLIC–Corporate, Larsen contends that the FSLIC–Corporate and subsequently the FDIC cannot assert the *D'Oench* doctrine on appeal because, among other reasons, this defense was not raised before the trial court. The initial question, therefore, is whether the FDIC can assert federal law defenses for the first time on appeal when the FDIC was not a party at trial, the trial parties could not have raised the federal law defenses, and the FDIC was not appointed until after appeal was taken from the adverse judgment.

This Court recently decided *FSLIC v. Stone*, 787 S.W.2d 475 (Tex.App.—Dallas, 1990, n.w.h.), which addressed similar issues regarding the applicability of the *D'Oench* doctrine when judgment was entered prior to the receivership. A review of *Stone*, therefore, is necessary. In *Stone*, the FSLIC became receiver for Sunbelt Savings & Loan Association on August 19, eighteen days after judgment was entered on August 1 against Sunbelt and in favor of Stone on claims of, among others, fraud, usury, wrongful foreclosure, and breach of fiduciary duty arising out of four written agreements. *Stone*, 787 S.W.2d at 478. Sunbelt filed several post-judgment motions, including a timely motion for new trial and a motion to reform the judgment which were overruled as a matter of law under Texas Rule of Civil Procedure 329b(e) on October 15. No reference was made in any of these motions to the *D'Oench* defenses. On October 27, the FSLIC and Sunbelt filed a motion raising *D'Oench* defenses. It was denied on November 9. *Id.* at 480–481. The *Stone* Court held that because the *D'Oench* motion was overruled on its merits within the period the trial court retained its plenary powers, the action of the trial court was reviewable on appeal. According to the Court, as a matter of state law, the FSLIC therefore timely raised the *D'Oench* issues in the trial court. *Id.* at 481. The *Stone* Court next addressed the question of whether the FSLIC could use the defenses against a valid state court judgment rendered before the FSLIC was named receiver.

In answering this question in the affirmative, the *Stone* Court declined to follow *Federal Savings & Loan Association v. Kennedy*, 732 S.W.2d 1 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), which held that when the FSLIC was appointed receiver following the trial court's entry of judgment, it did not have the right to relitigate the claim, and it simply "stepped into the shoes" of the failed institution, having the same but no greater rights than the failed institution to challenge the trial court's final judgment. *Stone*, 787 S.W.2d at 481 (citing *Kennedy*, 732 S.W.2d at 3). The *Stone* Court reasoned that the *Kennedy* holding ignored rights held by the

---

1. Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989), the FSLIC was abolished and its assets transferred to the FSLIC Resolution Fund. The FDIC was named manager of the Resolution Fund; therefore, the FDIC is the appropriate party in this litigation.

FSLIC as receiver that exceed the rights of the failed institution.[2] *Stone*, 787 S.W.2d at 481.

Next, the *Stone* Court considered the matter of assets for purposes of section 1823(e), which provides that no agreement which tends to diminish or defeat the right, title, or interest of the FDIC in any asset acquired by it shall be valid against the FDIC unless the listed requirements are met. *Id.* at 482–483. To determine whether particular assets were acquired by the FDIC when it was appointed receiver, a final resolution of those assets' validity was held to be required. The Court, therefore, addressed the question of whether the August 1 judgment constituted a final resolution of their validity. According to the *Stone* Court, for purposes of federal law the judgment rendered against Sunbelt Savings & Loan was not final so as to bar the FSLIC from asserting federal defenses after the trial court's judgment because it was not one "which was no longer subject to examination on appeal either because of the disposition on appeal and conclusion of the appellate process, or because of the passage, without action, of the time for seeking appellate review." *Stone*, 787 S.W.2d at 482 (citing *United States v. Lemaire*, 826 F.2d 387, 390 (5th Cir.1987), *cert. denied*, 485 U.S. 960, 108 S.Ct. 1223, 99 L.Ed.2d 423 (1988)).

Turning to the recently enacted Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the *Stone* Court concluded that sections 1821(d)(13)(A) and (B) of the Act provide that the FDIC on appeal can assert all rights available to it including the *D'Oench* doctrine. *Stone*, 787 S.W.2d at 482–483. The relevant sections of FIRREA provide:

**(13) Additional rights and duties**

  **(A) Prior final adjudication**

    The [FDIC] shall abide by any final unappealable judgment of any court of competent jurisdiction which was rendered before the appointment of the [FDIC] as conservator or receiver.

**(B) Rights and remedies of conservator or receiver**

    In the event of any appealable judgment, the [FDIC] shall—

  **(i)** have the rights and remedies available to the insured depository institution (before the appointment of such conservator or receiver) and the [FDIC] in its FDIC corporate capacity, including removal to Federal court and all appellate rights; and

  **(ii)** not be required to post any bond in order to pursue such remedies.

12 U.S.C.A. § 1821(d)(13)(A) and (B) (West 1989). Rejecting the contention that section 1821(d)(13)(B) addressed only standing, the Court noted that sections (A) and (B) distinguish between unappealable and appealable judgments and, in the case of appealable judgments, authorize the exercise of "rights and remedies" available not only to the failed institution, but all "rights and remedies" available to the FDIC in its corporate capacity. One of these rights is the protection provided in section 1823(e) against matters extraneous to bank records. Thus, Congress gave the FSLIC the ability to assert the *D'Oench* and section 1823(e) defenses post judgment. *Stone*, 787 S.W.2d at 483.

The *Stone* Court's holding that the FSLIC on appeal could assert all rights available to it placed it in disagreement with the decisions of several federal circuit courts. *See Grubb v. FDIC*, 868 F.2d 1151 (10th Cir.1989); *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266 (5th Cir.1989); *Thurman v. FSLIC*, 889 F.2d 1441 (5th Cir.1989). The *Stone* Court recognized this and addressed its disagreement with those decisions. *Stone*, 787 S.W.2d at 483. The *Stone* Court rejected the *Grubb* conclusion that a judgment voiding an asset left no asset for the receiver to acquire because it ignored the fact that an appealable judgment might be reversed, and therefore economic value remained in the asset itself. The *Stone* Court also disapproved of the *Grubb* Court's reasoning

---

**2.** The *Stone* Court noted that *Kennedy* was decided prior to the adoption of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, and therefore the Houston Court of Appeals did not have the benefit of section 1821(d)(13) of the Act, discussed *infra*.

that the outstanding judgment itself provided a reliable record that the notes were void because it did not consider that the Supreme Court in *Langley* rejected knowledge of the FDIC as a defense to *D'Oench*. See *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987). Furthermore, the *Stone* Court disagreed with the *Grubb* Court for failing to understand that a judgment falls short of satisfying the requirement of *D'Oench* and section 1823(e) of bank records contemporaneous to a transaction. *Id.* at 483–484.

Consistent with its interpretation of section 1821 of FIRREA, the *Stone* Court disapproved of the *Olney* Court's conclusion that section 1821(d)(13)(B) gave conservators and receivers standing to pursue all appeals that did not grant any new substantive rights in the appeal. The *Stone* Court faulted the *Olney* Court for omitting reference to subpart (A) of section 1821(d)(13) and considering only subpart (B). *Id.* at 484. In *Thurman*, the court relied on *Grubb* without reference to *Olney* or section 1821 and did not allow the FSLIC to assert a *D'Oench* defense post trial court judgment. For the same reasons that it declined to follow the *Grubb* decision, the *Stone* Court refused to follow *Thurman*. *Id.* at 485.

The *Stone* Court found support for its interpretation of FIRREA in *FDIC v. Taylor*, 727 F.Supp. 326, 328 (S.D.Tex.1989), which held that one of the section 1821(d)(13)(B) "remedies available to the FDIC in its corporate capacity" was the power of removal to federal court under 12 U.S.C. § 1819(b)(2)(B). *Stone*, 787 S.W.2d at 485–486. Likewise, according to the *Stone* Court, one of the "remedies available to the FDIC in its corporate capacity" is *D'Oench* and section 1823(e).

For the above reasons, the *Stone* Court held that the *D'Oench* federal law defenses were available to the FSLIC and could be raised to eviscerate a Texas state court appealable judgment rendered before the receivership. *Id.* at 485. In addition, the *Stone* Court rejected the assertion that the FSLIC's knowledge of the trial court judgment barred application of *D'Oench* and section 1823(e) because the Supreme Court in *Langley* held that knowledge was irrelevant to the application of section 1823(e). See *Langley*, 108 S.Ct. at 402.

■ In our view, the *Stone* decision is directly applicable to the case at bar. *Stone* held that section 1821(d)(13)(B) of FIRREA authorized the exercise of all rights and remedies available to the FDIC in its corporate capacity in the event of any *appealable* judgment. *Stone*, 787 S.W.2d at 483. As in *Stone*, the judgment in favor of Larsen is not a final, unappealable judgment under section 1821(d)(13)(B) because it is still subject to examination and correction on appeal. Consequently, the FDIC can assert the federal law defenses of *D'Oench* and section 1823(e) before this Court. This result occurs even though the federal defenses were not raised at trial or preserved for review on appeal. The *Stone* holding allows the FDIC to assert its federal defenses regardless of whether the question of their application was preserved at trial. See *Stone*, 787 S.W.2d at 481. In the present case, the federal defenses could not have been raised in the trial court. The FSLIC–Corporate did not become owner of the assets subject to this suit until over one year after judgment was entered; therefore, the FSLIC was not a party to the trial. Since the federal defenses are only available to the FDIC in certain capacities, American Savings could not have raised them at trial. In *Stone*, the issue of the application of the federal defenses was preserved for appeal because the defenses were raised in a post judgment motion during the period that the trial court retained its plenary powers. *Id.* Even so, this distinction is irrelevant to the outcome of the present case. Under *Stone*, as long as the judgment is appealable, the federal defenses can be raised, regardless of whether they were preserved for appeal.

■ In the present case, as in *Stone*, the fall back position of the party now asserting a claim against the FDIC is that the FDIC's knowledge of the trial court judgment at the time of the receivership bars the application of *D'Oench* defenses and section 1823(e). Larsen contends that even

if federal law defenses are generally available on appeal to the FDIC, none of those defenses is available here because the FDIC knew of the judgment against American Savings at the time of the declaration of insolvency and was therefore not misled. We disagree. As previously noted, the United States Supreme Court expressly negated the relevancy of knowledge to the application of *D'Oench* and section 1823(e). *D'Oench*, 315 U.S. at 459, 62 S.Ct. at 680; *Langley*, 108 S.Ct. at 402. Harm to the FDIC and those who rely upon the solvency of its fund is not avoided by knowledge at the time of acquiring the asset. *Langley*, 108 S.Ct. at 402–03. Accordingly, we hold that FDIC's knowledge of the outstanding judgment below at the time it was appointed receiver does not bar the application of *D'Oench* and section 1823(e) defenses.

▮ Having concluded that the FDIC can assert *D'Oench* and section 1823(e), we turn to the effect of these defenses on Larsen's claims. The federal law defenses claimed by the FDIC arise out of the United States Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), which held that secret agreements, such as those designed to deceive creditors or the public authority or tending to have that effect, could not be a defense in a suit by the FDIC because such agreements would tend to deceive the banking authorities. *D'Oench*, 315 U.S. at 459–60, 62 S.Ct. at 680–81. Congress codified *D'Oench* in the Federal Deposit Insurance Act of 1950, section 2(13)(e), 64 Stat. 889, as amended, 12 U.S.C.A. section 1823(e) (West 1989), which provides:

(e) **Agreements against interests of [FDIC]**

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e) (West 1989). In general, courts have noted the importance of the FDIC in stabilizing and protecting the nations's banking system. *See, e.g., FDIC v. Castle*, 781 F.2d 1101, 1106 (5th Cir. 1986); *Gunter v. Hutcheson*, 674 F.2d 862, 869 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). More specifically, one purpose of section 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. *Langley*, 108 S.Ct. at 401. A second purpose is to ensure mature consideration of unusual loan transactions by some bank officials and prevent fraudulent insertion of new terms with the collusion of bank employees when a bank appears headed for failure. *Id.* at 401. For this reason, with respect to an agreement varying the terms of a note, section 1823(e) requires that the agreement be on file in the bank's records at the time of the examination, that it be executed and put in the bank records contemporaneously with the taking of the note, and that it be approved by the officially recorded action of the bank's board or loan committee. *Id.*

▮ The United States Supreme Court expanded the scope of the *D'Oench* doctrine in *Langley v. FDIC*. *See FDIC v. CLR Partnership*, 683 F.Supp. 549, 551 (M.D.La.1988), *aff'd*, 866 F.2d 1418 (5th Cir.1989). The *Langley* Court construed the term "agreement" in section 1823(e) to include the parties' bargain, as reflected in their express or implied conditions upon their performance. *Langley*, 108 S.Ct. at 401. The term agreement, as used in sec-

tion 1823(e), therefore, is not limited to an express promise to perform an act. *Id.; FDIC v. Sarvis*, 697 F.Supp. 1161, 1163 (D.Colo.1988). In *Langley*, the petitioners asserted, as a defense to a note held by the FDIC, that the note was procured by the bank's misrepresentations. *Langley*, 108 S.Ct. at 400. The *Langley* Court held that a condition to payment of a note, including the truth of an express warranty, was part of the "agreement" to which the requirements of section 1823(e) attached. Because the misrepresentations alleged did not meet the statutory requirements, they could not be asserted as defenses against the FDIC. *Id.* at 403.

The result under section 1823(e) is that agreements which do not meet the statutory requirements will not be enforceable against the FDIC. 12 U.S.C. § 1823(e); *Langley*, 108 S.Ct. at 403. In practice, section 1823(e) accomplishes this goal by barring the admission at trial of matters extraneous to banking records. *D'Oench*, 315 U.S. at 457, 62 S.Ct. at 679; *Stone*, 787 S.W.2d at 489–490. As characterized in *Stone*, "The essence of the *D'Oench* rule is that the FDIC is entitled to rely, to the exclusion of any extraneous matters, on the official bank records that set forth the rights and obligations of the bank and those to whom the bank lends money." *Stone*, 787 S.W.2d at 490. The *D'Oench* rule reflects "a federal policy to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [it] insures or to which it makes loans." *D'Oench*, 315 U.S. at 457, 62 S.Ct. at 679. The *Stone* Court also addressed the relationship between "defenses" and "affirmative claims," noting that the common borrower defenses are now often turned into affirmative claims for relief under the general category of "lender liability." *Stone*, 787 S.W.2d at 490. To the extent that the claims asserted against the FSLIC were based on the same type of matters extraneous to bank records in *D'Oench* and *Langley* when asserted as defenses, the *Stone* Court held that the rationale of *D'Oench* and *Langley* prevented use of extraneous

evidence to support affirmative claims. *Id.* The *Stone* Court reasoned that such claims, like defenses, would impermissibly reduce the value of the lender's assets. *Id.* Since the claims for affirmative relief asserted by borrowers invaded the exact areas that *D'Oench* and *Langley* were designed to protect, such as prudent consideration of lending practices and loans, proper recordation of transactions to guard against collusive reconstruction of terms, and the ability to determine the value of the assets of a failed institution, the *Stone* Court concluded that all of the claims asserted against the FSLIC based on evidence of matters extraneous to bank records fell within the protection of *D'Oench*.

■ In the present case, Larsen sought actual and punitive damages based on claims of fraud and misrepresentation. Larsen sought primary recovery on these claims from Broadmoor Villas and, on derivative theories of agency and alter ego, from Congressional and American Savings. Based on *Stone*, we conclude that the *D'Oench* protection extends to the claims asserted by Larsen. We agree with *Stone* that regardless of how the claims are characterized, the result is the same: impermissible reduction in the value of the lender's assets. Consequently, since evidence extraneous to banking records was admitted at trial, the issue is whether Larsen's claims against the FDIC fail as a matter of law under the principles set forth in *D'Oench* and section 1823(e). This raises the question of whether Larsen's claims can be sustained on evidence that meets the requirements of section 1823(e). Because of the format of the court's charge and the evidence supporting submission of the jury questions, we conclude that none of Larsen's claims can be thus sustained.

As appears from the questions in the court's charge, the fraudulent misrepresentations which Larsen claimed had caused him to execute the subordination agreement and refrain from foreclosing on his subordinate lien were all made on two separate occasions—at the meeting between Thompson and Gray on January 3, 1989, and at the meeting later in January held by

Charles Hagan at the club room of Broadmoor Villas. The charge delineates the specific representations there made respectively by Thompson and Hagan. The evidence supporting the submission of these questions, together with the form of the questions, makes it clear that all of the representations inquired about were oral. Thus, from the intrinsic character of the controlling jury questions, we determine that the underlying evidence as to fraudulent misrepresentation does not meet the requirements of section 1823(e). It is likewise clear from the form of the questions that the agency and alter ego aspects pertain solely to these oral misrepresentations. By their express terms, the agency and the alter ego questions relate only to those periods in time when the oral representations were made. Accordingly, we hold that all those findings in the court's charge which otherwise entitle Larsen to a recovery against American Savings are invalidated as to the FDIC as a matter of law under section 1823(e) as interpreted by *Langley.* We sustain the FDIC's first point of error.

Because of our disposition of the FDIC's first point of error, we do not reach the remaining points of error advanced by the FDIC or the cross-points advanced by Larsen.

The judgment of the trial court is reversed, and judgment is rendered in favor of the FDIC.