The **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Texas American Bank/Richardson, N.A., Appellant,**

v.

Abdel G. **ZOUBI, Appellee.**

No. 05–89–00739–CV.

Court of Appeals of Texas, Dallas.

June 29, 1990.

Patrick C. Guillot, Karen Roberts–Washington, Dallas, for appellant.

Kenneth A. Mayfield, Dallas, for appellee.

Before HOWELL, LAGARDE and THOMAS, JJ.

## OPINION

THOMAS, Justice.

The Federal Deposit Insurance Corporation (FDIC), as receiver for Texas American Bank/Richardson, N.A. (TAB), appeals a final judgment rendered against TAB in favor of Abdel G. Zoubi. Following the reasoning of this court in *FSLIC v. Stone*, 787 S.W.2d 475 (Tex.App.—Dallas, 1990, n.w.h.), and *FDIC/Manager Fund v. Larsen*, 793 S.W.2d 37 (Tex.App.—Dallas, 1990, n.w.h.), we hold that Zoubi's claim is barred as a matter of law. Accordingly, we reverse the trial court's judgment and render judgment in favor of FDIC.

## STATEMENT OF FACTS

This controversy revolves around the leasing of a parcel of land owned by Zoubi which was located in Garland, Dallas County, Texas. Zoubi purchased the property in the early 1980s and subsequently opened a car wash. Zoubi eventually leased the car wash to Larry Beren, who financed the lease through TAB. Beren defaulted on the lease in February 1986. As a result of this default, Beren entered into a Collateral Sale Agreement with TAB pursuant to which he agreed that the bank could sell the car wash equipment for $15,000 on or before March 31, 1986. Zoubi acknowledged this agreement by signing it in his capacity as landlord and owner of the property. The agreement was also signed by TAB's president, Larry Shumate. During this same time period, Zoubi was approached by a business group that offered to buy both the property and the car wash for $400,000. Zoubi discussed the offer with Shumate, who advised Zoubi not to sell because he had looked into the financial records of the buyers and they did not have enough money in their bank account with TAB to cover the $10,000 deposit check. Zoubi did not go through with the sale.

In early April 1986, Shumate informed Zoubi that the bank had located Mike and Janice Caylor, who were interested in leasing the car wash. On April 11, 1986, Zoubi, the Caylors, and two bank officers, Reginald George and Betty Rhea, met at the bank to sign papers with regard to the Caylor's lease. Zoubi and the Caylors entered into an Agreement of Lease and then, since TAB was financing the lease, the Caylors and George signed an Assignment of Lease, which was also acknowledged by Zoubi with his signature. During the same transaction, Zoubi signed a letter, dated April 11, 1986, in which he agreed to inform TAB of any default by the Caylors, and further agreed that if such a default did occur, the lease would remain in effect as long as the bank fulfilled the terms of the lease in place of the Caylors. Zoubi further signed a Landlord's Lien Subordination Agreement that subordinated his interest in the car wash equipment to TAB's interest in the same collateral.

The Caylors defaulted on the lease in November 1986, and TAB sold the collateral, applying the proceeds to the Caylor's indebtedness to the bank under the Assign-

ment of Lease. TAB then sued the Caylors, seeking a deficiency judgment. The Caylors counterclaimed against TAB and filed a cross-claim against Zoubi. Zoubi answered with a counterclaim against the Caylors and a cross-claim against TAB. The Caylors eventually settled with TAB and Zoubi, and the parties were realigned to reflect Zoubi's position as the plaintiff and TAB as the defendant. It was Zoubi's contention at trial that TAB owed him a fiduciary duty because officers of the bank had led him to believe that they were looking after his best interests with regard to the entire leasing arrangement, and that he had been told verbally by both George and Shumate that TAB was guaranteeing the Caylor's lease. Zoubi's version of the transaction was disputed by witnesses for TAB, but the jury rendered a verdict in favor of his breach of fiduciary duty cause of action, awarding Zoubi $5,000 in actual damages and $35,000 in exemplary damages. After an appeal had been perfected in this case, the FDIC took over TAB and substituted in as the appellant.

## FEDERAL LAW DEFENSES

It is the FDIC's argument on appeal that, as a matter of law, it cannot be held liable for a breach of TAB's fiduciary duty to Zoubi, if, in fact, such a duty was owed. The FDIC cites this Court's opinion in *Stone* as authority for its position that the federal law defenses set forth in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its progeny are available and can be raised to eviscerate a Texas state court appealable judgment rendered before the receivership of TAB took place. Further, the FDIC argues that, as the receiver of a failed national bank, it is not liable for exemplary damages.

In *Stone*, the plaintiffs filed suit against a financial institution alleging several causes of action, including breach of fiduciary duty, in connection with a construction loan. After a judgment in favor of the plaintiffs was entered by the trial court, but before the appellate timetable had run, the financial institution became insolvent and the Federal Savings and Loan Insur-

ance Corporation (FSLIC) was appointed as receiver. The FSLIC then substituted in, filing a motion to vacate the judgment or for new trial and raising for the first time federal law defenses under the *D'Oench* case. In *Stone*, we began our discussion by explaining the role of the FDIC in the affairs of an insolvent financial institution. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989), abolished the FSLIC and transferred its assets to the FSLIC Resolution Fund. In turn, the FDIC is the statutory successor to the FSLIC as manager of the FSLIC Resolution Fund. FIRREA § 215, 103 Stat. at 252. Therefore, federal statutory and common law that applies to the FDIC governed *Stone* as well as this appeal. *See also Larsen*, at 39–40.

The *D'Oench* doctrine was codified by Congress as the Federal Deposit Insurance Act of 1950, § 2[13](e), 64 Stat. 889, as amended, 12 U.S.C. § 1823(e). Section 1823(e) provides as follows:

No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e) (West 1989).

One purpose of section 1823(e) is to allow federal and state bank examiners

to rely on a bank's records in evaluating the worth of the bank's assets. *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). In this same vein, the test for the application of the *D'Oench* doctrine is whether a party has "lent himself to a scheme or arrangement" whereby banking authorities are likely to be misled. *D'Oench,* 315 U.S. at 460, 62 S.Ct. at 681. Zoubi argues that he in no way lent himself to such a scheme or arrangement. Rather, it is Zoubi's position that the *D'Oench* doctrine does not apply to this case because it was in TAB's best financial interest for Zoubi to lease his real property to the Caylors and so, in order to protect that interest, TAB agreed to guarantee the lease. Zoubi further contends that he did not participate in any scheme or arrangement designed to deceive any banking authorities because two officers of TAB, Shumate and George, represented to him that the bank had guaranteed the Caylor's lease. Finally, Zoubi points out that all of the transactions in which he participated were fully documented in writing. With regard to section 1823(e), Zoubi argues that this statutory provision does not apply to the facts of this case because the "agreement" discussed in section 1823(e) is one made between a depository institution and another concerning the acquisition of an asset by the depository institution which, if enforced, would diminish or defeat the interest of the FDIC in that asset. According to Zoubi, no such agreement exists in this case since he has never claimed an adverse interest in any asset held by TAB but, rather, seeks to enforce an obligation which TAB agreed to undertake in guaranteeing the Caylor's lease.

"The essence of the *D'Oench* rule is that the FDIC is entitled to rely, to the exclusion of any extraneous matters, on the official bank records that set forth the rights and obligations of the bank and those to whom the bank lends money." *Stone,* at 490. Zoubi's argument seems to suggest that the facts of this case do not fall under the rationale of *D'Oench* and section 1823(e) because TAB breached an alleged fiduciary duty owed to him, as opposed to his having engaged in some type of scheme to mislead banking authorities. The United States Supreme Court in *Langley* construed the term "agreement" in section 1823(e) to include the parties' entire bargain. Since the misrepresentations complained of in *Langley* were not reflected in any of the bank's documents, they did not meet the statutory requirements of section 1823(e) and could not be asserted as defenses against the FDIC. *Langley,* 108 S.Ct. at 401. Furthermore, the *Stone* Court made it clear that *D'Oench* and section 1823(e) apply equally to affirmative claims for relief so that matters extraneous to bank records may not be introduced at trial to support such claims. *Stone,* at 490–91; *Larsen,* at 44.

The facts of *Larsen* are similar to the situation before us. In that case, the Larsen Trust sold five acres of undeveloped property to Broadmoor Villas for development of a condominium project. Larsen retained a vendor's lien on the property which was expressly subordinate to a lien held by Commonwealth Savings Association, Broadmoor Villas' lender on the project. When Broadmoor Villas obtained refinancing from Congressional Mortgage Corporation, Larsen executed a subordination agreement in which he agreed that the deed of trust securing one of the notes owed to him by Broadmoor Villas would be subordinate to the lien created by the deed of trust given to Congressional. Larsen also executed a release agreement pursuant to which he agreed to release a portion of a second lien pro rata if and when he received partial payment on the note. Subsequently, Congressional assigned to American Savings the note received from Broadmoor Villas in the refinancing transaction and its first lien security interest under the deed of trust. When Broadmoor Villas defaulted under the terms of the loan agreement, American Savings foreclosed and bought the property at a public auction for an amount less than that which was owed to it, thereby extinguishing Larsen's second lien. Larsen then filed suit against Broadmoor Villas and Congressional alleging, among other things, fraud and misrepresentation by those two entities

with regard to the subordination and release agreements. American Savings intervened and Larsen obtained a favorable judgment against Broadmoor Villas, Congressional, and American Savings. After American Savings had appealed the judgment to this Court, FSLIC–Corporate purchased certain assets and assumed certain liabilities of American Savings and, eventually, the FDIC was substituted as appellant in the case.

Basing its opinion on *Stone*, this Court in *Larsen* held that the *D'Oench* protection extended to the affirmative claims asserted by Larsen and that regardless of how the claims were characterized, the result was the same: impermissible reduction in the value of the lender's assets. *Larsen*, at 44. This Court also noted that the evidence supporting the submission of jury questions regarding the fraudulent misrepresentations which Larsen claimed had caused him to execute the subordination agreement made it clear that all of the representations complained of were oral and, therefore, did not meet the requirements of section 1823(e). *Larsen*, at 45. Thus, the *Larsen* decision ultimately held that all of the findings in the trial court's charge that would have otherwise entitled Larsen to a recovery against American Savings were invalidated as to the FDIC as a matter of law under section 1823(e).

In the case before us, as in *Larsen*, all of the representations relied upon by Zoubi to support his breach of fiduciary duty claim were oral. We have already established in *Stone* that the *D'Oench* doctrine extends to affirmative claims for relief and, therefore, we reject Zoubi's argument that *D'Oench* does not apply. In *Larsen*, we held that the term "agreement," as set forth in section 1823(e), applies to claims based on fraud and misrepresentation, and so we also reject Zoubi's contention that section 1823(e) does not apply in this case. In addition, under the reasoning of *Stone*, all evidence introduced at trial of matters extraneous to TAB's banking records were erroneously admitted as a matter of federal law. *Stone*, at 491–92. Because the oral misrepresentations complained of by Zoubi do not meet the requirements of *D'Oench*

and section 1823(e), and because any award to Zoubi would, under the holdings of this Court in *Stone* and *Larsen*, impermissibly reduce the value of TAB's assets, we hold that Zoubi may not recover on his claim for breach of fiduciary duty against the FDIC as a matter of law. We sustain the FDIC's first point of error.

## EXEMPLARY DAMAGES

In its fourteenth point of error, the FDIC maintains that as receiver of a failed national bank it cannot, as a matter of law, be held liable for exemplary damages. *See Summers v. FDIC*, 592 F.Supp. 1240, 1243 (W.D.Okla.1984); *Professional Asset Management, Inc. v. Penn Square Bank, N.A.*, 566 F.Supp. 134, 136 (W.D.Okla. 1983); *Stone*, at 492. Zoubi does not dispute the correctness of the FDIC's position, but, instead, argues that since the award of exemplary damages was made against TAB at a time when it was still a solvent functional bank, the fact that TAB was subsequently taken over by the FDIC as receiver has no legal bearing on the imposition of exemplary damages. We disagree.

▪ In *Stone*, this Court concluded that section 1821 of Title 12 of the United States Code, as amended by FIRREA, provides that the FDIC can assert all federal law defenses available to it on appeal, even if the FDIC became the receiver for a defendant banking institution after a trial court judgment had been rendered. *Stone*, at 482–83. The relevant sections of FIRREA provide:

(13) Additional rights and duties

(A) Prior final adjudication

The Corporation [FDIC] shall abide by any final *unappealable* judgment of any court of competent jurisdiction which was rendered before the appointment of the Corporation [FDIC] as conservator or receiver.

(B) Rights and remedies of conservator or receiver

In the event of any *appealable* judgment, the Corporation [FDIC] as conservator or receiver shall—

(i) have all the rights and remedies available to the insured depository institution (before the appointment of such conservator or receiver) and *the Corporation [FDIC] in its corporate capacity ...*

12 U.S.C.A. § 1821(d)(13)(A) & (B) (West 1989) (emphasis added).

Thus, as we recognized in *Stone,* the FDIC "as receiver is analogous to a trustee in bankruptcy, which not only steps into the shoes of the debtor, but also the 'overshoes' of additional rights under federal law." *Stone,* at 482. This being the case, we hold that the federal law defense against the imposition of exemplary damages as set forth in *Summers* and *Penn Square* is available to the FDIC post-trial court judgment and we sustain the FDIC's fourteenth point of error. Because of our disposition of the FDIC's first and fourteenth points of error, it is unnecessary to reach the remaining points of error advanced by the FDIC. The trial court's judgment is reversed, and judgment is rendered in favor of the FDIC.