**Virgie M. GRAY, Successor Administrator with Will Annexed of the Estate of Elmer J. Gray, Appellant,**

**v.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First Mexia Bank, Appellee.**

**No. 01–91–00706–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 29, 1992.

---

Jay N. Gross, Eric J. Toher, Houston, for appellant.

Kerry L. Haliburton, Beverly Willis, Waco, for appellee.

Before OLIVER–PARROTT, C.J., and MIRABAL and PRICE,* JJ.

### OPINION ON MOTION FOR REHEARING

OLIVER–PARROTT, Chief Justice.

This case is an appeal from a judgment on a guaranty of a promissory note. We reverse and render a take-nothing judgment. We deny appellee's motion for rehearing, withdraw our previous opinion, and substitute the following opinion.

Prior to his death on December 26, 1986, Elmer J. Gray executed a guaranty agreement in October 1985 with First Mexia

---

* The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

Bank (First Mexia or the Bank) by which he guaranteed the first $150,000 of any then-existing or future debt owed to First Mexia by "Jesse Jones d/b/a Quality Pipe and Steel."

Thereafter, in August 1986, an earlier note, payable to First Mexia by Jesse Jones d/b/a Quality Pipe and Steel in the original principal sum of $141,086.38, was split into two separate notes, also payable to First Mexia by Jesse Jones d/b/a Quality Pipe and Steel. The two resulting notes were made out for the respective original principal sums of $41,185.22 and $100,482.32. The $100,482.32 note is the note at issue in this case, and was secured by certain tangible collateral.[1] After the note matured by its terms on February 7, 1987, Jones failed to repay the debt. Accordingly, on June 10, 1987, First Mexia brought suit against him on the note, obtaining a default judgment.

Following the judgment against Jones, First Mexia filed a claim against Elmer Gray's estate (the Estate) on January 2, 1988. That claim was rejected on January 28, 1988, by the individual who originally served the Estate as administrator. First Mexia then brought this suit on April 11, 1988, within the 90–day period provided by TEX.PROB.CODE ANN. § 313 (Vernon 1980) for suits on rejected claims. Meanwhile, on January 21, 1988, First Mexia had repossessed some of the collateral and on that date the president of the Bank sent to Jones a letter giving notice of the repossession and that the collateral would be subject to private sale after 10 days.[2] First

---

1. The $100,482.32 note does not on its face expressly refer to the tangible collateral, but the fact that it was so collateralized is clear when the $100,482.32 note is set in the context of the ongoing course of dealing between Jones and the Bank. The $141,086.38 note does expressly refer on its face to some of the tangible collateral, and all three notes contain cross-collateralization provisions, to the effect that any present or future agreement securing any other debt owed by the maker to the Bank "will also secure the payment of this note," which operate to cause the collateral to which the face of the $141,086.32 note refers and additional tangible collateral as well to secure all three notes. Moreover, a jury finding was obtained on this point. In response to question number six in the charge, the jury found that the $100,482.32 note was secured by the following items of collateral:

 1974 Diare 5–ton truck S/N DRH64HC602554;
 2 Kendall and Gent 1–1/8 OD Threader, 6–1/2 OD Pipe Threader;
 1–Sutton Hydraulic Power 5 Roll Trailer Mount Pipe Straightener, S/N 532;
 Wilson Livestock Trailer, S/N 2X3394;
 1970 Chevrolet Tractor Truck, S/N DH9200P123423;
 1964 Chevrolet 1–ton, S/N 4C363S156512;
 1982 Datsun, S/N JN1RS06S9CU626219; and
 Clark 10,000 lbs. Forklift.

 On appeal neither party challenges this jury finding and, independently, both parties expressly endorse it in their briefs.

2. The letter read as follows:

 January 21, 1988

 Mr. Jesse Jones dba Premier Pipe and Quality Pipe

 Rt. [ ] Box [ ]
 [ ], TX [ ]

 Re: 1982 Datsun Ser.# JN1RS06S9CU626219,
 1974 Diare 5-ton truck s/nDRH64HC602554
 1 Kendall and Gent 1–1/8 OD threader 6–1/2 OD pipe threader
 1 Kendall and Gent 1–1/8 OD threader 6–1/2 OD pipe threader
 1–Sutton Hydraulic power 5 roll trailer mount pipe straightener, s/n 532
 Wilson Livestock trailer s/n 2X3394
 1970 Chevrolet Tractor Trk. Ser. # DH9200P123423;
 1964 Chevrolet 1–ton Ser.4C363S156512;

 Dear Mr. Jones:
 The First Mexia Bank, Mexia, Texas, as secured party under the referenced notes and/or Security Agreements now in default, has taken possession of the collateral described above. The possession was taken on January 21, 1988.
 At 9:00 a.m. on January 31, 1988, or at any time thereafter, from time to time until sold, a private sale will be held to sell all of the collateral above referred to. This collateral is being held to secure the obligation arising from the Promissory Notes and/or Security Agreements described above.
 If the proceeds realized from the sale of this Collateral are not sufficient to satisfy the total amount due and owing under the Promissory Notes and/or Security Agreements, First Mexia Bank will hold the referenced maker and/or makers of the Note liable for any deficiency.

 Yours truly,
 /s/President

Mexia did not cause any similar notice to be sent to Mr. Gray's personal representative to communicate those same facts directly to the Estate until November 21, 1990,[3] long after the repossession and long after the Bank sold certain items of the collateral.[4]

By its second amended petition, the Bank claimed that, in addition to the guaranty agreement, there existed a second basis for holding the Estate liable for the balance on the note. The Bank asserted that Jones and Gray had been engaged in business together as a partnership at the time Jones had executed the note; that they had represented themselves to the Bank as partners; that the loan had been made to the partnership on the basis of those representations; and that along with Jones, Gray was jointly and severally liable for that partnership debt. At trial, the jury found, inter alia, (i) that Jones and Gray had been partners in the purchase of oilfield pipe, (ii) that the debt represented by the note was a partnership debt, and (iii) that the notice to Jones served as notice to Mr. Gray—or, more precisely, since it was posthumous, as notice to the Estate.

Judgment was rendered upon the jury verdict, and granted First Mexia an allowed and approved claim against the Estate for the full $100,482.32 principal amount of the note, plus pre- and postjudgment interest, costs, and attorneys' fees. The Estate perfected this appeal on July 17, 1991. Subsequently, First Mexia was declared insolvent on August 22, 1991, and the Federal Deposit Insurance Corporation (FDIC) was appointed receiver for First Mexia. The FDIC was duly substituted as appellee.

On appeal, the Estate asserts several "personal" defenses, contending that enforcement of the debt against the Estate is barred because: (1) there is no evidence, or alternatively, insufficient evidence to support the jury's finding that the debt evidenced by the note was a partnership debt [point of error three]; (2) even if the debt was a partnership debt, then it is still not enforceable against the Estate because as a matter of law the notice First Mexia sent to Jones did not constitute reasonable notification *to the Estate* of the Bank's repossession and intended disposition of the collateral, which the Bank was required to give under TEX.BUS. & COM.CODE ANN. § 9.504 (Vernon 1991); the trial court erred both in submitting the question of reasonable notification to the jury and in misstating the law in its instructions to the jury in connection with that question; and there was no evidence, or alternatively, insufficient evidence to support the jury's finding that the Bank gave reasonable notification to the Estate [points of error two and three]; (3) First Mexia failed to dispose of the repossessed collateral in a commercially reasonable manner, as also required by section 9.504, and there was no evidence, or alternatively, insufficient evidence, to support the jury's finding to the contrary [point of error four]; and/or (4) as a matter of law, First Mexia's retention of a portion of the collateral for over three years operated to discharge the debt under TEX.BUS. & COM.CODE ANN. § 9.505 (Vernon 1991) [point of error one].

Addressing the merits of the Estate's points of error, the FDIC in reply asserts that there is no bar to enforcement of the $100,482.32 note against the Estate, because: (1) there was factually and legally sufficient evidence to support the jury's finding that the debt evidenced by the note was a partnership debt [reply to point of error three]; (2) the notice First Mexia sent to Jones constituted reasonable notification *to the Estate* of the Bank's repossession

---

3. This notice was sent not from the Bank itself, but rather from the Bank's attorneys on behalf of the Bank. It was addressed to Mrs. Virgie M. Gray, and expressly stated that "this notice to you is in no way an admission that the Estate or you as Successor Administrator of the Estate are now or ever were entitled to such notice nor that notice has not been previously given as required by law."

4. The sales took place on March 18, March 29, and September 28, 1988; and October 18, 1989; and the collateral sold was, respectively, the 1982 Datsun, S/N JN1RS06S9CU626219; the 1964 Chevrolet 1-ton, S/N 4C363S156512; the 1970 Chevrolet Tractor Truck, S/N DH9200P123423; and the Wilson Livestock Trailer, S/N 2X3394.

and intended disposition of the collateral because acceptance of notice under section 9.504 fell within the scope of the limited authority to act for Mr. Gray after his death that Jones retained under the provisions of the Texas Uniform Partnership Act, TEX.REV.CIV.STAT.ANN. art. 6132b (Vernon 1970) ("Texas UPA"), such that the notice to Jones was sufficient to preserve the right to collect the note balance from the Estate; therefore, the trial court's submission of the question of reasonable notification to the jury and its instructions to the jury in connection with that question were both correct, and there was factually and legally sufficient evidence to support the jury's finding that reasonable notification of the Bank's repossession and intended disposition of the collateral was given to the Estate [reply to points of error two and three]; (3) there was factually and legally sufficient evidence to support the jury's finding that First Mexia disposed of the repossessed collateral in a commercially reasonable manner [reply to point of error four]; and/or (4) First Mexia's retention of a *portion of the collateral for over three* years did not operate to discharge the debt under § 9.505 of the Texas Business and Commerce Code [reply to point of error one]. In its supplemental brief, filed after completion of oral argument in the case at bar, among five issues there discussed, the FDIC raised the additional contention that (5) any defects in the notice of sale of the collateral do not prevent enforcement of the $100,482.32 note because (a) the Bank's notice pertained only to the $41,185.22 note (which is not at issue in this case); (b) the sales took place in connection only with the $41,185.22 note and not the $100,482.32 note; and (c) the proceeds were applied only to the $41,185.22 note and not the $100,482.32 note ["Issue No. 5" in the FDIC's supplemental brief].

Finally, the FDIC also asserts, in both its original and supplemental briefs, that, in any event, regardless of the merits of the Estate's points of error, under the federal common law flowing from *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its partial codification at 12

U.S.C. § 1823(e) (1989), the FDIC takes the note free of the personal defenses that the Estate asserts. Because it is potentially dispositive, we address this latter assertion at the outset.

**Federal common law defenses are unavailable to the FDIC on this appeal because they were first raised after perfection of the appeal.**

■ After the Estate had already perfected this appeal, the FDIC was substituted as a party to this action on November 27, 1991, because of its appointment as receiver for First Mexia. Of course, First Mexia did not raise the federal common law defenses in the trial court. It did not do so because it could not have done so. Those defenses are available, if at all, only to the FDIC and similar regulatory authorities, because of their role in protecting the banking system itself. *Langley v. FDIC*, 484 U.S. 86, 91–93, 108 S.Ct. 396, 399, 98 L.Ed.2d 340 (1987). Later, when the FDIC was appointed receiver, it simply stepped into the shoes of First Mexia. The FDIC gained no rights to challenge the judgment of the trial court except those which First Mexia then possessed. *FSLIC v. Kennedy*, 732 S.W.2d 1, 3 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). The subsequent enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Act of August 9, 1989, Pub.L. No. 101–73, 1989 U.S.C.C.A.N. (103 Stat.) 183 (codified at 12 U.S.C. §§ 1811–1833e) did not alter this result. The relevant provision of FIRREA states:

(B) Rights and remedies of Conservator or Receiver—In the event of any appealable judgment, the Corporation as conservator or receiver shall—

(i) have all the rights and remedies available to the insured depository institution (before the appointment of such conservator or receiver) and the Corporation in its corporate capacity, including removal to Federal court and all appellate rights....

12 U.S.C. § 1821(d)(13)(B)(i) (1989). This amendment neither granted new substantive rights to the FDIC, nor enlarged the

FDIC's then-existing substantive rights, beyond merely extending the right of appeal to its successor, the Resolution Trust Corporation, in its capacity as receiver. *Olney Sav. and Loan Ass'n v. Trinity Banc Sav. Ass'n,* 885 F.2d 266, 275 (5th Cir.1989); *accord, Baumann v. Savers Fed. Sav. and Loan Ass'n,* 934 F.2d 1506, 1511–12 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992).

This Court has expressly elected to follow the reasoning of the decisions of the Fifth Circuit and the federal district courts sitting in Texas [5] rather than that reflected in several decisions of the Dallas Court of Appeals.[6] In *Beach v. R.T.C.,* 821 S.W.2d 241, 244 (Tex.App.—Houston [1st Dist.] 1991, no writ), we held that the federal common law defenses, when not available to the bank in the trial court, cannot be raised for the first time on appeal to eviscerate or otherwise disturb a Texas state court judgment adjudicating the respective rights of an institution and opposing parties before that institution is placed into receivership. Our holding in *Beach* is fully consistent with the Texas Supreme Court's recent decision in *Larsen v. FDIC/Manager Fund,* 835 S.W.2d 66 (1992), handed down after oral argument in the instant case and discussed by the FDIC in its supplemental brief.

In *Larsen,* the supreme court reversed the Dallas Court of Appeals' decision [7] by which the Dallas court had elected to follow its own prior decision in *FSLIC v. T.F. Stone–Liberty Land Associates,*[8] and held that the FDIC was entitled to raise its *D'Oench, Duhme*-type defenses for the first time on appeal. The supreme court carefully examined *Thurman, Olney,* and *Grubb,* and other federal decisions as well,[9] and undertook to reconcile all of them under the 11th Circuit's analysis in *Baumann.* 835 S.W.2d at 73–74. It concluded that

> FIRREA *may* offer an opportunity for the FDIC (or RTC) to present an argument for the first time on appeal because it never had power in the first instance before; however, if the judgment was against the financial institution and resulted in the voiding of the asset, ... then it may not assert such defense to set aside the judgment voiding the asset. The federal appellate decisions are all in agreement: [12 U.S.C. § 1821] does not give the FDIC the absolute new substantive right to assert *D'Oench, Duhme*-type federal defenses for the first time on appeal. Under Texas procedure, absent "fundamental error" ... *a court of*

---

5. *Thurman v. Federal Deposit Ins. Corp.,* 889 F.2d 1441, 1446–47 (5th Cir.1989); *Olney,* 885 F.2d at 274–75; *First Republic Bank Fort Worth v. Norglass, Inc.,* 751 F.Supp. 1224, 1231–32 (N.D.Tex.1990); *see also AmWest Sav. Ass'n v. Farmers Mkt. of Odessa,* 753 F.Supp. 1339, 1343–44 (W.D.Tex.1990) (when rendered before receivership is initiated, trial court's judgment constitutes a "secured claim" against failed institution until and unless judgment is reversed on appeal); *Grubb v. Federal Deposit Ins. Corp.,* 868 F.2d 1151, 1157–59 (10th Cir.1989).

6. *Federal Deposit Ins. Corp. v. F & A Equip. Leasing,* 800 S.W.2d 231 (Tex.App.—Dallas 1990), *rev'd,* 835 S.W.2d 74 (1992); *FDIC/Manager Fund v. Larsen,* 793 S.W.2d 37 (Tex.App.—Dallas 1990), *rev'd,* 835 S.W.2d 66 (1992); *Federal Deposit Ins. Corp. v. Zoubi,* 792 S.W.2d 825 (Tex.App.—Dallas 1990, no writ); *FSLIC v. T.F. Stone–Liberty Land Assoc.,* 787 S.W.2d 475 (Tex.App.—Dallas 1990, writ granted).

7. 793 S.W.2d 37 (Tex.App.—Dallas 1990), *rev'd* 835 S.W.2d 66 (1992).

8. 787 S.W.2d 475 (Tex.App.—Dallas 1990, writ granted).

9. *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *FDIC v. Meyerland Co.,* 960 F.2d 512 (5th Cir.1992); *RTC v. McCrory,* 951 F.2d 68 (5th Cir.1992); *Baumann,* 934 F.2d 1506; *First Interstate Bank v. First Nat'l Bank,* 928 F.2d 153 (5th Cir.1991); *Union Federal Bank v. Minyard,* 919 F.2d 335 (5th Cir.1990); *FDIC v. Castle,* 781 F.2d 1101 (5th Cir.1986); *FDIC v. Merchants Nat'l Bank,* 725 F.2d 634 (11th Cir.), *cert. denied,* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984); *FDIC v. Prann,* 694 F.Supp. 1027 (D.P.R.1988), *aff'd sub nom. FDIC v. Bracero & Rivera, Inc.,* 895 F.2d 824 (1st Cir. 1990); *FDIC v. Nemecek,* 641 F.Supp. 740 (D.Kan.1986); and some unspecified number of unidentified "federal district court memorandum opinions, some unpublished and some to be published" cited by the FDIC in that case, and which the FDIC there asserted to be "contrary to the results in *Olney* and *Thurman* in one manner or another." 835 S.W.2d at 72.

*appeals has no discretion to reverse an error-free judgment*[10] *based on a new argument ... raised for the first time on appeal.*[11]

835 S.W.2d at 74 (emphasis added). The supreme court then concluded that the Dallas Court of Appeals had "erred in holding that the FDIC had the right to assert *D'Oench, Duhme*-type defenses for the first time on appeal under 12 U.S.C. § 1821." *Id.*

■ We read *Larsen* as deciding that when a trial court renders judgment against a financial institution, resulting in voiding of the asset, then the FDIC may not assert its *D'Oench, Duhme*-type defenses for the first time on appeal. We do not read *Larsen* as deciding that the FDIC is prohibited from asserting its *D'Oench, Duhme*-type defenses for the first time on appeal *only* when the judgment of the trial court is against the financial institution. The *Larsen* opinion leaves open the question of whether the FDIC may assert its *D'Oench, Duhme*-type defenses for the first time on appeal when the judgment of the trial court is in favor of the predecessor financial institution, as here. The *Larsen* opinion is not silent on that question, however. On the contrary, it speaks to us, and does so more than plainly enough. The supreme court reaffirmed the applicability, even in the *D'Oench, Duhme* context, of the well-established rule of Texas procedure that, in general, an argument may not be raised for the first time on appeal. That fact, coupled with the fact that, as the *Larsen* court observed, the federal appellate decisions are all in agreement that the FDIC has no absolute right to assert its *D'Oench, Duhme*-type defenses for the first time on appeal, convinces us that a new exception to that general rule is not mandated by the federal case law under *D'Oench, Duhme*. Nor are we convinced

that a new exception, which would allow the FDIC to raise its *D'Oench, Duhme*-type defenses for the first time on appeal in the instant case, is otherwise warranted.

It is true that in the instant case, unlike in *Larsen*, the trial court rendered judgment in favor of First Mexia, the failed financial institution, and that, unlike in *Larsen*, the trial court's judgment in the instant case did not void the $100,482.32 note, the asset in question. The fact that the trial court's judgment did not void the $100,482.32 note before First Mexia failed, standing alone, is not, however, sufficient to warrant a result unlike that in *Larsen*.

If the Estate is correct in its contention that as a matter of law the notice First Mexia sent to Jones did not constitute the reasonable notification *to the Estate* of the Bank's repossession and intended disposition of the collateral that the Bank was required to give under section 9.504, then every event necessary to the Estate's showing itself entitled to the voiding of the $100,482.32 note as against the Estate took place prior to the appointment of the FDIC as receiver for First Mexia. If the Estate shows on this appeal that as a matter of law the Estate was entitled to judgment in its favor in the trial court, then it follows that the judgment that *should* have been entered before First Mexia failed *would* have voided the $100,482.32 note prior to First Mexia's failure, *but for the trial court's error*. In such a circumstance, the federal policies underlying the *D'Oench, Duhme*-type defenses are deprived of their raison d'etre. If the federal banking regulators are misled in their evaluation of the failed institution's assets in such a circumstance, then *it is the trial court's error that misleads them.* That error cannot properly be laid at the feet of a party who did not lead the trial court into that error, but who instead undertook to prevent that

---

**10.** Presumably, this reference, more precisely phrased, is meant to refer to a judgment free of fundamental error rather than a judgment which is literally "error-free," since a valid trial court judgment which is literally without error should not be reversed in any event, regardless of what argument is raised and when it is raised.

**11.** Compare the exposition of federal procedure in *Baumann*, 934 F.2d at 1512–13: federal courts of appeals have broad discretion to relax the general rule that an argument may not be raised for the first time on appeal, which is operative whether or not the argument addresses the types of considerations which are "fundamental error" under Texas procedure.

error by efforts that properly preserve the point for appeal under state procedure. Such a party cannot rationally be said to have "lent himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled," *D'Oench*, 315 U.S. at 460, 62 S.Ct. at 681, unless in the events of the underlying transaction that precipitated the trial there exists some basis for such an assertion. In the instant case, the FDIC has neither argued that the Bank's alleged failure to give proper notice under section 9.504 is attributable to some act of Mr. Gray or any agent or representative of his, nor otherwise asserted that any such basis exists. In this instance, much as in *Beach*, it is not the Bank or the FDIC that is in need of protection, but instead the Estate, when confronted by a defense first asserted on appeal at a time when Mr. Gray has no opportunity to respond. *Beach*, 821 S.W.2d at 244.

■ Consistent with our prior decision in *Beach* and with *Larsen* as well, we hold that the federal common law defenses, when not available in the trial court to a financial institution subsequently placed into receivership, cannot be raised for the first time on appeal to eviscerate or otherwise disturb a Texas state trial court judgment that adjudicates the respective rights of the institution and the other parties and that is rendered before the receivership, regardless of whether that judgment is rendered in favor of or against the institution.

Our analysis does not address the question of whether *D'Oench, Duhme*-type defenses can be raised for the first time on appeal where not every event necessary to the losing party's showing itself entitled to the voiding of the asset takes place prior to the failure of the institution, and where further proceedings in the trial court would be necessary after an appellate reversal of the original trial court judgment in order for that appellant ultimately to prevail— i.e., where the trial court's error is one that would permit the appellate court to reverse and remand but not to reverse and render. We express no opinion on whether *D'Oench, Duhme*-type defenses can be

raised for the first time on appeal in such a situation, because that situation is not before us. If the question remained an open one after *Beach* and before our disposition of the instant case, then it remains no less so after our opinion today.

It remains to be seen whether the Estate is indeed correct in its contention that as a matter of law the notice First Mexia sent to Jones did not constitute the reasonable notification *to the Estate* of the Bank's repossession and intended disposition of the collateral which the Bank was required to give under section 9.504. Accordingly, we proceed to the merits of the points of error raised by the Estate and of the FDIC's remaining reply points.

**There was legally and factually sufficient evidence to support the jury's finding that the debt in question was a partnership debt.**

■ Upon a challenge to the legal sufficiency of the evidence supporting a jury finding, we may consider only that evidence, and reasonable inferences from it, which supports the jury's finding, and must disregard evidence and inferences to the contrary. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). When there is more than a scintilla of evidence in support of the finding, a no evidence point of error must be overruled. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). When addressing a point of error challenging the factual sufficiency of the evidence supporting a jury finding, we consider and weigh all the evidence, including both that supporting the finding and the evidence contrary to the finding, and sustain the point if the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989).

■ The $100,482.32 note was an extension and renewal of a portion of an earlier note for $141,086.38. That earlier note shows on its face that the purpose of the loan it represents is to purchase pipe and for operating expenses. It also shows on its face that it was secured by, among other collateral, "all pipe inventory wherev-

er located," three pipe threaders, and one pipe straightener. Jones testified that he signed the $100,482.32 note so that he and Gray could purchase oil field pipe, sell the pipe, and split the profits. He also testified that he considered himself and Gray to be partners on the particular purchase made with the proceeds of the $100,482.32 note. Richardson, a vice-president of the Bank, testified that he also considered Jones and Gray partners on that particular transaction. Finally, a letter from Gray to the Bank was admitted into evidence, in which Gray stated, in reference to the earlier note for $141,086.38, that "I am aware of the circumstances surrounding the note of Mr. Jones. I have no objection to this note being extended 180 days." There was legally sufficient evidence to support the jury's finding.

The Estate has not pointed to any evidence in the record that tends to show that the debt was not a partnership debt, beyond the language of the $100,482.32 note itself. The Estate contends that that note shows on its face that it is a personal obligation of Jones. The borrower's name, as listed at the top of the note, is "Jesse Jones d/b/a Quality Pipe and Steel," but at the bottom the note is signed only by Jesse Jones without any indication there that Jones signed in his capacity as a partner, e.g. "Quality Pipe and Steel by: /s/ Jesse Jones." That language is some evidence that the debt was a personal obligation of Jones and not a partnership debt, but it falls far short of having the extreme degree of probative value the Estate attributes to it. Certainly it is not dispositive of this case. *See and compare Womack v. First Nat'l Bank of San Augustine*, 613 S.W.2d 548, 551 n. 1 (Tex.Civ.App.—Tyler 1981, no writ) (notes bearing name "McClan-ahan Farms" at top and to which Charles McClanahan signed his and his brother's name were properly found to be partner-

ship obligations) and *First State Bank of Riesel v. Dyer*, 254 S.W.2d 92 (Tex.1953) (affirming instructed verdict that note bearing name "Waco Gibson Tractor Sales" at top [12] but signed only by Woodside and his wife and not by Woodside's partner Dyer created no partnership obligation for which Dyer could be liable).

The only other evidence we find in the record that tends to show the debt was not a partnership debt is (a) Jones' testimony that Quality Pipe and Steel was a sole proprietorship and that that was known to the Bank; (b) the testimony of Wendell Woodruff, the decedent's employee, that Quality Pipe and Steel was a sole proprietorship and that Jones never indicated to him that Gray would receive part of any profit eventually generated by the pipe purchased with the proceeds of the note; (c) the opinion testimony of the Estate's expert witness Greg Riker, a banker, that the note reflected a loan to Jesse Jones in his individual capacity.

■ The bulk of the evidence germane to whether the debt was a partnership debt was oral testimony. The jury was entitled to believe or disbelieve each witness in accordance with its assessment of his credibility. *Leyva v. Pacheco*, 358 S.W.2d 547, 549 (Tex.1962).

The jury's finding that the debt was a partnership debt is supported by factually as well as legally sufficient evidence. The Estate's complaint about that finding, raised in the Estate's point of error three, is overruled.

**The notice First Mexia sent to Jones did not constitute the reasonable notification *to the Estate* which the Bank was required to give under section 9.504 of the Business and Commerce Code.**

■ A partner in a general partnership is personally liable for partnership debts jointly and severally with all other partners. *Rice v. Travelers Express Co.*, 407 S.W.2d 534, 537 (Tex.Civ.App.—Houston

12. *Womack* distinguishes *Dyer* on the basis that, *inter alia*, "[i]n *Dyer*, there was nothing on the note to indicate that liability thereon was anything more than the personal obligation of Woodside and his wife." 613 S.W.2d at 555. According to the opinion of the Court of Ap-

peals in the *Dyer* case, however, the name "Waco Gibson Tractor Sales" (the name of the partnership at issue there) did appear at the top of the note sued upon in that case. *See* 248 S.W.2d 785 at 787.

1966, no writ). Following his death, this obligation is to be satisfied from the estate of the deceased partner. TEX.REV.CIV.STAT. ANN. art. 6132b, § 40(a)(II), (b)(I), and (g) (Vernon 1970). Neither party has undertaken to argue to the contrary. Their dispute is not whether the Estate was obligated in the first instance for the unpaid balance on the note, but instead whether that state of affairs was subsequently altered by the operation of section 9.504 of the Texas Business and Commerce Code.

■ When a secured party seeks to dispose of collateral after default by its debtor, section 9.504(c) requires that

every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.... *[R]easonable* notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made [of the collateral] *shall* be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

(emphasis added). Both the commercial reasonableness requirement and the reasonable notification requirement embodied in this section must be met, or collection of any deficiency from the debtor is barred. *Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769, 771 (Tex.1982); *Carroll v. General Elec. Credit Corp.,* 734 S.W.2d 153, 155 (Tex.App.—Houston [1st Dist.] 1987, no writ). The Estate can be liable for the unpaid balance on the note if and only if the Bank gave the Estate reasonable notification under section 9.504. Again, the parties' dispute does not concern the *consequences* of giving or failing to give the reasonable notification required by this section. Instead, the narrow question they present to us is *whether notice of intended disposition of collateral given to a surviving partner by a partnership creditor constitutes reasonable notification under section 9.504 to the estate of the deceased partner, when given at a time when the partnership creditor has* *actual knowledge of both the identity of the deceased partner and of his death.*

■ The FDIC contends that this question is controlled by the scope of the limited authority to act for Mr. Gray after his death that Jones retained under the provisions of the Texas UPA. Analyzing the question on that basis, we first note that the record affirmatively indicates that there was no contrary agreement between Jones and Gray to vary the effect of any of the provisions of the Texas UPA. Absent such an agreement, the partnership was dissolved upon Mr. Gray's death, section 31(4), and Jones' authority to act for the partnership ended, except as otherwise expressly provided in section 33. *McKellar v. Bracewell,* 473 S.W.2d 542, 549 (Tex.Civ. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.). From the moment of Mr. Gray's death, Jones had authority (i) to wind up the partnership under section 37, and (ii) to bind the partnership to third persons as set forth in section 35. The FDIC reasons that Jones had authority to accept notice under section 9.504 on behalf of the Estate because the acceptance of such notice is part of "the prosecution of this lawsuit in an attempt to collect a preexisting indebtedness from the Estate, [which] is consistent with" both payment of partnership debts and the completion of transactions begun but not yet finished at dissolution, both of which are properly part of the winding up of the partnership.

We do not reach the question of whether Jones' limited authority under sections 37 and 35 of the Texas UPA encompassed authority to receive section 9.504 notice on behalf of Mr. Gray or the Estate, because we do not agree with the FDIC that that question controls the reasonable notification question. Even if we were to accept the FDIC's argument that the acceptance of notice under section 9.504 on behalf of the Estate was facially part of Jones' authority under sections 37 and 35, we believe that this argument inappropriately focuses upon the relations between Jones and Gray to the near-total exclusion of an examination of the Bank's own conduct. Even if Jones indeed had the authority the FDIC argues he had, the Bank was still required

under section 9.504 to give notice that constituted "reasonable notification" given all the surrounding facts and circumstances.

 Reasonable notification means notification reasonably calculated to give actual notice of the relevant fact to the person responsible for acting upon that fact. *See Adcock v. First City Bank of Alice*, 802 S.W.2d 305, 307 n. 3 (Tex.App.—San Antonio 1990, no writ) (reasonable steps to give actual knowledge to debtor required, so debtor may bid or insure that sale is commercially reasonable); *MBank Dallas, N.A. v. Sunbelt Mfg., Inc.*, 710 S.W.2d 633, 635–36 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (purpose of notice is to enable debtor to act to protect his interest in the collateral); *see also Vermont Nat'l Bank v. Hamilton*, 149 Vt. 477, 546 A.2d 1349, 1352 and 1350 (1988) (auction announcement in newspaper was not reasonable notification under Vermont UCC § 9–504(3) to guarantors of bankrupt original primary debtor, even as to guarantor who actually saw announcement and attended auction). Although giving the best notification or full and complete notification is not required, *Siboney Corp. v. Chicago Pneumatic Tool Co.*, 572 S.W.2d 4, 6 (Tex. Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.), what constitutes reasonable notice will vary with the particular facts and circumstances of each case. It follows that there will be times when more than absolute minimal notification must be given if notification is to be reasonable notification.

 Neither party has argued that the Bank had at any time an affirmative duty to seek out knowledge of changes in the composition of the partnership or otherwise to look beyond its own records for more current information concerning the identity of the partners and/or their whereabouts,

and we express no opinion on the existence of any such duty. In this instance, however, whether it did so pursuant to an affirmative effort connected with such a duty, or instead learned the information through mere fortuity, before it supposedly gave notice to the Estate by giving notice to Jones, the Bank *did acquire* knowledge both that Gray was Jones' partner and that Mr. Gray had died. In fact, 19 days *before* the Bank repossessed the collateral, the Bank had filed with Mr. Gray's personal representative a claim against the Estate for this debt. Prudence and common sense dictated that since the disposition of the Estate's assets was the responsibility of Mr. Gray's personal representative, *not* Jones, the personal representative was the relevant person to whom to give section 9.504 notice in order to preserve the right to reach those assets. After Mr. Gray was gone, section 9.504 operated to require the Bank to give notification in a manner reasonably calculated to give *the personal representative* actual notice of the Bank's intended disposition of the collateral.

 The Bank pleaded generally that all conditions precedent to the liability of the Estate on the Bank's claim had occurred. The Estate specifically denied that all such conditions had occurred, pleading that the Bank did not give notice to Mr. Gray or the Estate of either the repossession, intended disposition, or actual disposition of the collateral, and also that the disposition of the collateral was not commercially reasonable. Compliance with section 9.504 was therefore an element of the Bank's cause of action against the Estate. *See Greathouse v. Charter Nat'l Bank Southwest*, 795 S.W.2d 1, 2 (Tex.App.—Houston [1st Dist.] 1990) (if debtor specifically alleges lack of commercial reasonableness or lack of notice, then creditor has burden of proof on the matter);[13] *see also*

13. Our decision in *Greathouse* has been affirmed by the Texas Supreme Court. *Greathouse v. Charter National Bank–Southwest*, 35 Tex.Sup.Ct.J. 1017, 1992 WL 379408 (July 1, 1992). The supreme court held that

a creditor in a deficiency suit must plead that disposition of the collateral was commercially reasonable. This may be pleaded specifically or by averring generally that all conditions

precedent have been performed or have occurred. If pleaded generally, the creditor is required to prove that the disposition of collateral was commercially reasonable only if the debtor specifically denies it in his answer. Should the creditor plead specifically, then it must, of course, prove the allegation in order to obtain a favorable judgment.

*Hull v. Crocker Equip. Leasing*, 737 S.W.2d 1, 3 (Tex.App.—Houston [14th Dist.] 1987, writ denied) (burden of proving that sale of collateral conducted in commercially reasonable manner is upon secured party). We find no indication in the record that it was impossible or impractical or even particularly difficult for the Bank to give section 9.504 notice directly to the personal representative. Absent any such indication, in the face of the Bank's knowledge of Mr. Gray's identity and of his death, it was unreasonable for the Bank to do less than give direct notification to the personal representative. We hold that in this case, the notification the Bank gave to Jones was not reasonable notification to the Estate within the meaning of section 9.504, as a matter of law.

 In addition to his liability as a partner of the partnership the jury found to have existed, Gray had potential liability as a guarantor, which liability was independent of his status as a partner in any partnership. This fact is no comfort to the FDIC, however. A guarantor is a "debtor" for purposes of section 9.504, and is entitled to the reasonable notification mandated by that section. Moreover, the consequences of failing to give that notification are the same whether it was to have been given to a guarantor or the original primary debtor. *Carroll*, 734 S.W.2d at 154–55. As set forth above, the Bank failed to notify Mr. Gray or his Estate of the repossession and intended disposition of the collateral until well after sale of a portion of the collateral had taken place. The FDIC as successor to the Bank is therefore barred from recovering from the Estate as successor to Mr. Gray in his capacity as partner. That same failure bars the FDIC from recovering from the Estate as successor to Mr. Gray in his capacity as guarantor.

35 Tex.Sup.Ct.J. at 1020. As of this writing, the supreme court opinion has not yet been released for publication in the permanent law reports, and remains subject to revision or withdrawal.

**14.** The FDIC appears to read our decision in *Beach* as based exclusively upon imputing

In the course of the foregoing analysis, we have already taken into account the questions of merger into a judgment, imputation of knowledge [14] and, expressly, whether the FDIC may raise its *D'Oench, Duhme*-type defenses for the first time on appeal. These questions constitute only three of the five issues the FDIC discusses in its supplemental brief, however. While the analysis we have undertaken thus far dictates that the Estate's assignments of error in points of error two and three concerning the notice question should be sustained, the FDIC raises, in the discussion of one of the remaining two issues in its supplemental brief, an assertion which, if meritorious, would avoid the effect of that analysis. We now turn our attention to that assertion.

**There is no merit in the FDIC's assertion that the enforcement of the $100,482.32 note against the Estate is not barred because the Bank's notice of sale of the collateral related only to another note or notes but not to the $100,482.32 note. In any event, that assertion has been waived, both because it is an affirmative defense or matter in avoidance that may not be raised for the first time on appeal, and because the Bank failed to preserve it in the trial court.**

 As noted above, in a supplemental brief filed after completion of oral argument in this case, the FDIC asserts that (i) the Bank's repossession and disposition of the collateral took place exclusively under the $41,185.22 note, and that (ii) the proceeds from the sales of collateral were applied solely to the $41,185.22 note. From these two premises, the FDIC reasons that the notice of sale of the collateral and any defects in it pertain *only* to the $41,185.22 note, preventing enforcement of *that* note—which is not at issue in this case—but not preventing enforcement of the

knowledge to the regulatory agency that the note at issue there had been dishonored and was overdue from the fact that the note had been reduced to judgment prior to the receivership. We do not agree with such a reading.

$100,482.32 note with which we are concerned here.

The FDIC cites *Knights of Columbus Credit Union v. Stock*, 814 S.W.2d 427 (Tex.App.—Dallas 1991, writ denied) as its sole authority to support its reasoning. In *Stock*, the credit union had three outstanding loans to Stock, numbered three, four, and five—which, due to the operation of cross-collateralization language in all three sets of loan documents, were all secured by the same collateral. Stock defaulted on all three loans, and in due course the credit union sent a letter intended to give Stock notice of its intended disposition of collateral it had repossessed. The letter described the collateral, and expressly referred to loan number five, without any reference to loans numbers three and four. The proceeds of the subsequent foreclosure sale were applied to loan number five.[15] The Dallas Court of Appeals held that the deficiencies in that letter were such that the letter did not constitute adequate section 9.504 notice, but also that the defective notice precluded recovery of a deficiency *only* under loan number five and not under either of the other two loans secured by the same collateral. The FDIC contends that *Stock* controls this case. We disagree.

The FDIC correctly observes that the notice letter dated January 21, 1988, and sent by the Bank to Jones does not state what note formed the basis for the foreclosure contemplated. The January 21, 1988, letter merely refers to the collateral to be sold, which collateral secured the $100,482.32 note as well as the $41,185.22 note.[16] In addition, although the January 21, 1988, notice letter does not state what note formed the basis for the foreclosure contemplated, it refers repeatedly to "notes and/or security agreements," using the plural in each instance in which it speaks of the repossession and prospective sale. At only one juncture, at the very end, the letter refers to the "note," singular, when it speaks of holding the maker and/or mak-

ers of the "note" liable for any deficiency. Given the letter's preceding references to "notes," plural, the debtor receiving such a letter could reasonably construe the word "note" in this final reference to holding the maker and/or makers of the "note" liable for any deficiency to mean "each respective note." These facts suffice readily to distinguish the case at bar from the *Stock* case the FDIC cites, in which the notice letter at issue referred to common collateral but then expressly referred by loan number to only one of a number of cross-collateralized loans secured by that common collateral. *See* 814 S.W.2d at 430. The distinction is such that we read *Stock*, itself to support an outcome here opposite to that in *Stock*. Unlike the letter in *Stock*, the letter at issue here did *not* notify the Estate that the Bank "intended action only on [one specifically identified loan]." 814 S.W.2d at 431. If the Bank's subjective intent genuinely was to act only on the $41,185.22 note and not the $100,482.32 note, then its January 1988 notice letter was desperately far short of adequate to communicate that fact.

■■■■ The giving of notice under section 9.504 is an affirmative duty running from the creditor to the debtor. *Stra, Inc. v. Seafirst Commercial Corp.*, 727 S.W.2d 591, 594 (Tex.App.—Houston [1st Dist.] 1987, no writ); *First City Bank–Farmers Branch v. Guex*, 659 S.W.2d 734, 738 n. 9 (Tex.App.—Dallas 1983), *aff'd*, 677 S.W.2d 25 (Tex.1984). Its purpose is to enable the debtor to take steps to protect his interests prior to foreclosure. *Van Brunt v. BancTexas Quorum, N.A.*, 804 S.W.2d 117, 120 (Tex.App.—Dallas 1989, no writ). In general, any failure of the creditor adequately to fulfill that duty falls upon the creditor in the form of a bar to bringing suit for any deficiency. *Whirlybirds Leasing Co. v. Aerospatiale Helicopter Corp.*, 749 S.W.2d 915, 918 (Tex.App.—Dallas 1988, no writ). We see no logical reason why a different

---

15. "After crediting Stock with the proceeds of the sale, the credit union sued Stock for the *deficiency* on loan number five and the *balances due* on loans number three and four." 814 S.W.2d at 429 (emphasis added).

16. Regarding these propositions, see nn. 2 and 1, respectively.

rule should apply to the particular variety of failure that the Bank practiced here. A creditor's failure to identify the particular loan upon which action is intended impairs its debtor's ability to respond with maximal effectiveness and to focus his efforts upon only the specific and genuine threat to his interests. A debtor is entitled to the opportunity so to respond, and his creditor should not be permitted through its own omissions or commissions to force him instead to divide his attention and his resources among some larger number of perils, one of which is real and the others of which are at best mere illusions produced by his creditor's careless draftsmanship or which, in a worst-case scenario, could be a deliberate breach by his creditor of its section 9.504 duty, carefully designed by the creditor to prevent its debtor from protecting his interests.

■ We hold that a creditor who undertakes to give notice of intent to sell common collateral to enforce only one or some of a greater number of cross-collateralized loans bears the burden of communicating the fact that the sale is for enforcement of fewer than all of those loans and of identifying with sufficient particularity the specific loans being enforced. We further hold that, upon its failure to bear that burden, such a creditor is to be barred from bringing suit for any deficiency on any loan which the debtor could, in light of the defective section 9.504 notice, reasonably have believed was to be enforced by means of that sale. That bar would, absent some evidence in the record to warrant a different conclusion, typically encompass all loans between the same parties that are secured in whole or in part by any of the collateral sold.

■ We further hold that the FDIC's assertion that the Bank's notice of sale of the collateral was given not under the $100,482.32 note, but instead under the $41,185.22 note, is in the nature of an affirmative defense or matter in avoidance, directed to the Estate's pleading that Jones lacked authority to accept section 9.504 notice for Mr. Gray or his Estate in connection with the $100,482.32 note. *See Stew-*

*art v. Chovanec,* 738 S.W.2d 776, 778 (Tex. App.—Fort Worth 1987, no writ) (Stewart's defense to personal liability, that he signed contract at issue not as an individual but as a representative of Gemcraft Homes, Inc., was a matter in avoidance). As such, TEX. R.CIV.P. 94 required that the Bank plead the matter affirmatively. The Bank did not do so. Accordingly, it may not be raised for the first time on appeal. *Gilbert v. Smedley,* 612 S.W.2d 270, 275 (Tex. App.—Fort Worth 1981, writ ref'd n.r.e.); *Myrick v. Myrick,* 601 S.W.2d 152, 153 (Tex.Civ.App.—Waco 1980, no writ).

Finally, independent of the application of TEX.R.CIV.P. 94, we note that at trial the Bank did not submit a jury question on whether the collateral was repossessed and sold (i) exclusively under the $41,185.22 note, or rather (ii) under the $100,482.32 note instead of or as well as under the $41,185.22 note. Nor did the Bank object to the Estate's failure to submit such a question. The Bank also failed to submit a jury question on whether the proceeds from the sales of collateral were applied (i) exclusively to the $41,185.22 note, or rather (ii) to the $100,482.32 note instead of or as well as to the $41,185.22 note, and failed to object to the Estate's failure to submit such a question. Certainly, there was no proof sufficient to establish the answer to either question as a matter of law.

The FDIC correctly observes that there was evidence admitted at trial—once again, the testimony of the Bank's vice-president Richardson—to the effect that the collateral was repossessed and sold exclusively under the $41,185.22 note and not the $100,482.32 note. Richardson's testimony does not, of course, establish the matter testified to as a matter of law. The jury was entitled to believe or disbelieve all or any part of Richardson's testimony on this point, as it saw fit. *Burt v. Lochausen,* 249 S.W.2d 194, 199 (Tex.1952). Moreover, there was evidence from which the jury could validly have concluded that the collateral was repossessed and sold under the $100,482.32 note as well as under the $41,-185.22 note.

We have already analyzed the language of the January 21, 1988, notice letter. Similarly, the November 21, 1990, notice letter [17] does not identify the note or notes to which it pertained; instead, it merely referred to the particular items of collateral that then remained in the possession of the Bank after the 1988 and 1989 sales. That later letter speaks of an opportunity to redeem that collateral "by tendering payment of *all obligations secured by the collateral* as well as the Bank's expenses[.]" That statement tends to prove that the collateral to which it refers was repossessed and that sale was contemplated to satisfy the $100,482.32 note—which had at that point not yet been reduced to judgment—as well as the $41,185.22 note. Richardson's testimony on direct examination showed that all collateral—both that which was subsequently sold in the 1988 and 1989 sales and that which remained thereafter in the possession of the Bank—was repossessed in a single transaction on January 21, 1988. Taken together, the redemption provision in the November 1990 letter and Richardson's testimony tend to prove that the collateral sold in the 1988 and 1989 sales was repossessed and sold to satisfy the $100,482.32 note as well as the $41,185.22 note.

In addition, the November 1990 letter also states, in its final sentence, that "the providing of this notice shall not act as a waiver of any of the claims or defenses of the Bank in the lawsuit styled *First Mexia Bank v. Conway F. Jordan, Jr., as Administrator With Will Annexed of the Estate of Elmer J. Gray, Deceased,* No. 212101-401, in the Probate Court Number Two (2) of Harris County, Texas." The FDIC admits—and, indeed, tenaciously argues—that the instant suit is founded only on the $100,482.32 note and not the $41,185.22 note. The claims and defenses in this suit had to do only with the $100,482.32 note and not the $41,185.22 note. Since Richardson testified that all collateral repossessed was repossessed in a single transaction on January 21, 1988, the jury could conclude that the claims and defenses

in this suit were potentially affected by the November 1990 letter precisely because that collateral—which included the collateral sold in the 1988 and 1989 sales—was repossessed and sold to satisfy the $100,482.32 note as well as the $41,185.22 note.

Notwithstanding the contrary statement of one interested witness testifying for the Bank, there was ample evidence from which the jury could validly have concluded that the collateral was repossessed and sold under the $100,482.32 note as well as under the $41,185.22 note.

■ The analysis of the evidence concerning to which note or notes the proceeds from the sales of collateral were applied is simpler. The FDIC has directed our attention to no evidence in the record tending to show that the proceeds were applied exclusively to the $41,185.22 note. The only such evidence our own independent search of the record has revealed is, again, a single statement from Richardson on cross-examination. When Richardson testified that he had a high bid of $8,500 on the pipe straightener, he was asked, "Which loan are you planning to apply that to when you get the money?" He replied, "I'm going to apply it to the note that it was securing, the [$41,185.22] note." This statement concerned only a portion of the collateral securing the $100,482.32 note, of course, and was no more binding upon the jury than Richardson's other statement that the collateral was repossessed and sold exclusively under the $41,185.22 note. *Burt,* 249 S.W.2d at 199. We have already held that the jury could validly have concluded from the two notice letters that the collateral was repossessed and sold under the $100,482.32 note as well as under the $41,185.22 note; from that same evidence, the jury could validly have concluded that the proceeds of those sales were applied to the $100,482.32 note as well as the $41,185.22 note.

In sum, neither of the two premises of the FDIC's argument—i.e. that the Bank's repossession and disposition of the collateral took place exclusively under the $41,185.22 note, and the proceeds from the sales of collateral were applied solely to the

---

**17.** See n. 3 and accompanying text.

$41,185.22 note—was established as a matter of law by the evidence presented in this case. Accordingly, we need not decide whether either question was properly an element of the Estate's defense that proper section 9.504 notice was not given, or instead was an element of the Bank's counter to that defense; either way, any complaint the FDIC does or could attempt to raise about the lack of such a question has been waived under TEX.R.CIV.P. 278 and 279.

**The denouement is rendition of judgment for the Estate.**

The Estate's assignments of error concerning the notice question are sustained. We do not reach the questions raised in the Estate's first and fourth points of error and in the appellee's replies to those points.

The final remaining issue discussed in the appellee's supplemental brief is whether, upon reversing the judgment of the trial court, this Court may render judgment for the Estate or instead must remand the case for new trial. In that discussion, the appellee concedes that since the Estate's assignments of error concerning the notice question raised in point of error three raise an issue of law and, when sustained, permit rendition of judgment for the Estate. The assignments of error concerning the notice question, in point of error two as well as point three, have indeed been sustained. Independent of appellee's concession, we draw the same conclusion appellee draws— that rendition of judgment for the Estate is both permitted and the appropriate disposition here. *See* TEX.R.APP.P. 81(c) (when judgment below is reversed, appellate court *shall* proceed to render the judgment that the court below should have rendered, except when remand is *necessary* ); *see also Trapp v. Shell Oil Co.*, 198 S.W.2d 424, 441 (Tex.1946) (when issue to be determined is a question of law, remand is both unnecessary and wasteful).

We reverse the judgment of the trial court, and render a take-nothing judgment in favor of the Estate on the FDIC's claim.