## TEXAS UTILITIES ELECTRIC COMPANY, Appellant,

v.

## CITY OF WACO, Appellee.

No. 10–94–285–CV.

Court of Appeals of Texas, Waco.

Aug. 31, 1995.

Rehearing Denied Oct. 18, 1995.

R. Coke Mills, Mills, Millar, Matkin & Cullar, Waco, Richard L. Adams, Worsham, Forsythe, Sampels & Wooldridge, L.L.P., Dallas, for appellant.

Philip E. McCleery & Jeffrey R. Cox, Sheehy, Lovelace & Mayfield, Waco, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

Texas Utilities Electric Company (TU Electric) appeals the granting of a declaratory judgment in favor of appellee, the City of Waco (Waco). Through two points of error TU Electric argues: (1) the trial court erred in construing the terms of a contract between it and Waco; and (2) the trial court erred in admitting testimony concerning the meaning of several terms of the contract in violation of the parol evidence rule and the doctrine of merger because the contract was not ambiguous. We reverse and render judgment in favor of TU Electric.

The contract at issue is a 1991 franchise agreement (the Waco franchise) whereby TU Electric agreed to pay Waco certain sums of money for the use of the roads, alleys, and other passageways owned by Waco to provide electricity to the city and its residents. The Waco franchise is similar to the franchises used by many municipalities throughout Texas in calculating the amount of compensation due them from TU Electric. The record indicates that these franchises typically run for a fixed number of years; that TU Electric usually pays the municipality a certain percentage of its gross receipts for the use of its property; that payment is made on a periodic basis; and that payment is either made on an accrual basis, meaning payment is made at the end of the payment period, or it is prepaid before the payment period begins.[1] The Waco franchise provided that TU Electric would, for fifteen years, pay the city 3% of its gross receipts every quarter and that payment would be made on the accrual basis.

The parties did not agree to the Waco franchise until after considerable bargaining and negotiating had taken place. Part of the reason for the extensive negotiation process was Waco's awareness that the City of Dallas was being paid 4% of TU Electric's gross receipts there and Waco's belief that it should be paid at the same rate. TU Electric, on the other hand, aware that its franchise with Dallas was due to expire within the next two years, believed that it would be able to reduce Dallas' payment rate to 3%. TU Electric, consequently, was unwilling to set Waco's payment rate at 4%. In the end, the parties agreed to a payment rate of 3% but also incorporated a "Most Favored Nations Provision" into the Waco franchise which assured Waco that it would receive any payment rate higher than 3% provided to any other municipality with which TU Electric had a franchise agreement. The Most Favored Nations Provision reads:

If [TU Electric] shall at any time after the effective date of this franchise pay a franchise or street rental fee ..., renew or extend a franchise ordinance agreement adopted by any municipality on or after the effective date of this ordinance ... and that franchise agreement or street rental ordinance provides for payment to the municipality for the use of said municipality's public rights-of-way in an amount, *however characterized*, higher than three (3) percent of [TU Electric]'s gross receipts (from sale of electric energy) in said municipality, then [TU Electric]'s payments under this section shall be increased to that proportionately higher rate of [TU Electric]'s said gross receipts within [Waco].

(emphasis added).

The parties operated under the agreement without incident until October 1993 when TU Electric and the City of Dallas, after several lengthy delays, finally negotiated their new franchise agreement (the Dallas franchise). Under the new Dallas franchise, TU Electric, despite its efforts to lower Dallas' payment rate, agreed to a payment rate of 4%. It also agreed to change Dallas' accounting system from the accrual basis to the prepaid basis.

TU Electric, true to the Most Favored Nations Provision to which it had agreed with Waco, promptly informed Waco of the 4% payment rate in the new Dallas franchise and increased the payment rate to Waco from 3% to 4%. Waco gladly accepted the increase in its payment rate, but, after learning of the change in Dallas' accounting system and considering the pecuniary benefits of switching from the accrual system to the prepaid system, decided that such a switch effectively increased Dallas' payment rate to above 4% and, therefore, because of the Most Favored Nations Provision, Waco was entitled to the same benefit. TU Electric rejected Waco's claim, contending that an exception (the Exception Clause) to the Most Favored Nations Provision allowed it to deny this benefit to Waco. The putative exception is located several sentences after the portion of the Most Favored Nations Provision quoted above, and it reads:

Provided that nothing herein shall alter or affect the dates upon which the payments specified in this franchise are payable or

---

1. Whether a municipality's franchise fee is calculated on the accrual basis or the prepaid basis is referred to as the municipality's "accounting system."

the period to which each of said payments [is] referable.

At trial Waco argued that the change in Dallas' accounting system was a benefit "however characterized" as provided for under the Most Favored Nations Provision and that the Exception Clause was not applicable. To bolster its argument, Waco introduced the testimony of parties from both TU Electric and Waco who were involved in negotiating the Waco franchise. In essence, witnesses for both parties explained that the reason for including the Most Favored Nations Provision was to assure Waco that it would receive any benefit provided any other municipality, including benefits other than just from increases in payment rates. But, with regard to the Exception Clause, no one from Waco could explain the reason for its inclusion; witnesses for TU Electric, however, explained that the clause was intended to deny Waco any changes in accounting systems.

TU Electric objected to any testimony explaining the meaning of either the Most Favored Nations Provision or the Exception Clause. It maintained that their meaning was clear and unambiguous from the language of the provisions and that, therefore, any reference to other evidence to help explain their meaning was impermissible under both the parol evidence rule and the merger doctrine. The trial court disagreed and admitted the testimony. Once the bench trial was completed, the court ruled that TU Electric was required to change Waco's accounting system in the same manner that it had changed Dallas'. TU Electric timely appealed the judgment to this court.

■ Parol evidence is not admissible to explain the meaning of an unambiguous contract. *See State Farm Mutual Auto. Ins. Co. v. Azima,* 896 S.W.2d 177, 178–79 (Tex. 1995) (per curiam). If the contract is not ambiguous, the construction of its terms is a question of law for the court. *Westwind Exploration, Inc. v. Homestate Savings Ass'n,* 696 S.W.2d 378, 381 (Tex.1985). The construction of an ambiguous contract, however, is a question for the trier of fact. *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987). TU Electric argues in its second point that the terms of the Waco

franchise are unambiguous and, therefore, the trial court erred in admitting parol evidence to explain the meaning of its terms. Waco, in response, asserts that the contract is ambiguous and, therefore, parol evidence was necessary to elucidate the meaning of its terms to the trier of fact.

The arguments by the parties on ambiguity center on the proper construction of the Most Favored Nations Provision and the Exception Clause. We will address the Exception Clause first.

■ The rules of contract construction require that all parts of a contract be read as a whole. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). The following portion of the Waco franchise bears directly upon the meaning of the Exception Clause:

> The franchise fee shall be payable quarterly to [Waco].... The first payment pursuant to this franchise shall be made on or before August 15, 1991, and shall be based upon [TU Electric]'s gross receipts during the six (6) months ended the previous June 30th and shall be payment hereunder for said six (6) months. Subsequent payments shall be made quarterly on or before November 15, February 15, May 15 and August 15 of each year (the first such quarterly payment being due and payable on November 15, 1991), each of said quarterly payments being based upon [TU Electric]'s said gross receipts during the most recent calendar quarter preceding the month in which the payment is due and payable and being payment hereunder for that calendar quarter.

The above-quoted portion of the franchise clearly and unambiguously designates the dates upon which payment is due; specifies that payment, after the initial six months of the franchise, is to be calculated on a quarterly basis; indicates that the amount of the payment shall be calculated according to the amount of the gross receipts collected during the calendar quarter immediately preceding the month in which payment is due; and stipulates that the payment shall be for this same calendar quarter. The Exception Clause states that "nothing herein shall alter or affect the dates upon which the payments

specified in this franchise are payable or the period to which each of said payments [is] referable."

 Waco reads the Exception Clause as separating the period upon which the payment is calculated (the payment period) from the period for which the payment is due (the privilege period).[2] Such separation would lead to the conclusion that the Exception Clause only allows TU Electric to deny Waco a change granted another municipality in the payment period but not the privilege period. However, because the provisions of the franchise quoted above clearly state that these periods are to be the same, we conclude that the Exception Clause, in excluding from the Most Favored Nations Provision changes in the period to which payments are referable, applies to changes in the payment period as well as to any change in the privilege period. Therefore, the Exception Clause permits TU Electric to deny Waco the benefit of Dallas' change in its privilege period. Furthermore, because these provisions are unambiguous, the trial court erred in admitting parol evidence to explain their meaning.

Despite the clear meaning of the Exception Clause, Waco asserts that a construction of the term "however characterized" is necessary to a proper resolution of this appeal. Regardless of whether the change in Dallas' accounting system constitutes a benefit "however characterized" under the Waco franchise, the Exception Clause clearly and unambiguously allows TU Electric to deny this benefit to Waco. *See Forbau,* 876 S.W.2d at 133–34 (specific time limitation on insurance coverage controls over general grant of coverage). Consequently, the meaning of "however characterized" is irrelevant to the issues presented here. *See George Grubbs Enter., Inc. v. Bien,* 881 S.W.2d 843, 851 n. 7 (Tex.App.—Fort Worth 1994), *rev'd on other grounds,* 900 S.W.2d 337 (Tex.1995).

 When an issue to be determined is a question of law, an appellate court may render judgment instead of remanding the case for further proceedings. TEX.R.APP.P. 81(c); *Gray v. Federal Deposit Ins. Corp.,* 841

S.W.2d 72, 89 (Tex.App.—Houston [1st Dist.] 1992), *writ dism'd by agr.,* 848 S.W.2d 85 (Tex.1993). The construction of an unambiguous contract is a question of law. *Westwind Exploration,* 696 S.W.2d at 381. The terms of the Waco franchise relevant to this appeal are clear and unambiguous in permitting TU Electric to deny Waco the benefit of the change in the accounting system afforded to Dallas. Accordingly, we sustain TU Electric's first point of error, reverse the judgment of the trial court, and render a take-nothing judgment in favor of TU Electric.

---

2. The term "privilege period" is used to describe the period for which payment is due, apparently because reference is being made to the time during which the municipality has allowed the utility company the privilege of using its property.